## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

JAIME A. DAVIDSON SR.,
p/k/a "Gringo," "Gringo El Original," "Gringo Man,"
Plaintiff,



FILED BY _____ D.C.

FEB 0 9 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Vs.                                    Case No. _____

J&N RECORDS, INC. d/b/a J&N MUSIC GROUP,
MAYIMBA MUSIC, INC.,
THE ORCHARD ENTERPRISES NY, INC.,
SONY MUSIC ENTERTAINMENT,
SONY MUSIC ENTERTAINMENT US LATIN LLC,
Defendants.

_____/

## COMPLAINT FOR COPYRIGHT INFRINGEMENT, FALSE COPYRIGHT MANAGEMENT INFORMATION (DMCA), DECLARATORY RELIEF, ACCOUNTING AND DISGORGEMENT, AND UNJUST ENRICHMENT (JURY TRIAL DEMANDED)

**COMES NOW**, Plaintiff, JAIME A. DAVIDSON, **("Plaintiff" or "Mr. Davidson"),** proceeding

**pro-se,** and alleges as follows:

### I. NATURE OF THE ACTION

1.       This is a civil action arising from Defendants' commercial exploitation of

Plaintiff's original sound recording album and associated works commonly known as "Donde Lo

Conseguiste" and related recordings, including Defendants' unauthorized release, distribution,

1

monetization, and misattribution practices while Plaintiff was unavailable to protect his rights due to incarceration.

2.      Plaintiff is a recording artist and author known professionally as "Gringo," "Gringo El Original," and "Gringo Man." Plaintiff's name, identity, and catalog have been commercially exploited in connection with releases, re-releases, distributor feeds, platform metadata, and royalty routing associated with Defendants' catalog activities.

3.      Plaintiff alleges that Defendants released and exploited Plaintiff's album and works without a lawful written authorization from Plaintiff and without any valid written transfer of copyright ownership satisfying the Copyright Act's writing requirement for transfers.

4.      Plaintiff further alleges that Defendants provided, removed, altered, and distributed false copyright management information ("CMI") connected to Plaintiff's works, including credits, ownership data, and metadata affecting attribution and royalty routing across digital platforms.

5.      Plaintiff also seeks declaratory relief to establish Plaintiff's rights and Defendants' infringement posture, and equitable relief including accounting and disgorgement of revenues and profits attributable to Defendants' exploitation of Plaintiff's works and identity.

## II. JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act, 17 U.S.C. §§ 101 et seq., and the Digital Millennium Copyright Act, including 17 U.S.C. § 1202.

7.    This Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201–2202.

8.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's unjust enrichment claim because it forms part of the same case or controversy as Plaintiff's federal claims.

9.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(a) because a substantial part of the events giving rise to the claims occurred in this District, Defendants conduct substantial business in this District, and Defendants distributed and monetized the infringing works through digital platforms accessible within this District, causing injury to Plaintiff in Florida.

10.    Defendants purposefully directed conduct toward Florida by distributing, licensing, administering, and monetizing Plaintiff's works and related catalog through commercial channels and digital platforms that reach Florida consumers, and by engaging in conduct that caused economic and reputational harm to Plaintiff in Florida.

## III. PARTIES

11.    Plaintiff JAIME A. DAVIDSON SR. is a natural person and citizen of Florida. Plaintiff is professionally known as "Gringo," "Gringo El Original," and "Gringo Man."

12.    Defendant J&N RECORDS, INC. d/b/a J&N MUSIC GROUP is a business entity that, upon information and belief, has participated in the release, administration, marketing, distribution, and monetization of Plaintiff's works and associated catalog.

3

13.     Defendant MAYIMBA MUSIC, INC. is a business entity that, upon information and belief, participated in distribution, catalog administration, licensing, monetization, or related exploitation of Plaintiff's works and associated catalog.

14.     Defendant THE ORCHARD ENTERPRISES NY, INC. is a business entity engaged in music distribution and digital delivery and, upon information and belief, distributed and monetized recordings and catalog content connected to Plaintiff's works through digital platforms and distributor feeds.

15.     Defendant SONY MUSIC ENTERTAINMENT is a business entity that, upon information and belief, participated in distribution, licensing, administration, monetization, or catalog handling connected to Plaintiff's works.

16.     Defendant SONY MUSIC ENTERTAINMENT US LATIN LLC is a business entity that, upon information and belief, participated in distribution, licensing, administration, monetization, or catalog handling connected to Plaintiff's works.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Authorship, Identity, and Lack of Written Transfer

17.     Plaintiff authored and performed the works at issue and is the original artist publicly identified with the album and catalog commonly known as "Donde Lo Conseguiste."

18.     Plaintiff never executed any written assignment, work-for-hire agreement, exclusive license, or other written transfer of copyright ownership to J&N Records, J&N Music Group, Mayimba Music, The Orchard, Sony Music Entertainment, Sony Music Entertainment

US Latin LLC, or any other entity, and no such written instrument exists as required under **17 U.S.C. § 204(a).**

19.     Plaintiff's catalog has been commercially exploited while Plaintiff was incarcerated and unable to engage in ordinary marketplace monitoring, enforcement, or catalog administration.

**B. Registration Posture and Public Records**

20.     Plaintiff has completed registration for the Donde Lo Conseguiste album as reflected by the U.S. Copyright Office certificate preview and public record printout confirming key registration fields. See Exhibit U (Unofficial Certificate Preview for Registration SR0001054582) and See Exhibit V (U.S. Copyright Office Public Records printout reflecting Registration SR0001054582, including catalog data fields and "Publisher Label Number: J&N Records").

21.     Plaintiff alleges that the registration materials and public records support Plaintiff's priority, authorship posture, and the plausibility of Plaintiff's ownership and infringement allegations at the pleading stage. See Exhibits U–V.

**C. Unauthorized Release and Exploitation While Plaintiff Was Unavailable**

22.     Plaintiff alleges that Defendants released, distributed, and monetized Plaintiff's album and related recordings without Plaintiff's written authorization and without paying Plaintiff royalties derived from sales, digital streaming, distribution, and other exploitation.

23.     Plaintiff further alleges that Defendants exploited Plaintiff's name, stage identity, and catalog reputation to market, distribute, and monetize the catalog during Plaintiff's incarceration.

24.     Defendants' exploitation has continued into the modern digital era through platform listings, distributor feeds, and catalog metadata presented to consumers and streaming services.

**D. Impersonation and Substitute Performer Arrangement While Plaintiff Was Incarcerated**

25.     As further shown by the declaration of Omar Antonio Pacheco Bonilla, Exhibit L-2, J&N Records and its Panama-side intermediaries arranged for a substitute performer to appear publicly as "Gringo" or "Gringo Man" in or about 1992 to promote and monetize the album while Plaintiff was unable to appear due to incarceration.

26.     The declaration described in Exhibit L-2 is a declaration executed under **28 U.S.C. § 1746,** signed via DocuSign, by a declarant physically located in Panama City, Republic of Panama, and it is submitted to support plausibility, notice, and willfulness at the pleading stage, with admissibility and weight to be determined at later stages of proceedings. See Exhibit L-2.

27.     Plaintiff alleges that this impersonation-based promotion, combined with Defendants' catalog exploitation, supports a plausible inference of willfulness, knowledge, and deliberate commercial strategy to monetize the catalog while Plaintiff was unavailable.

### E. "Feliz Navidad" Misattribution and Royalty Diversion Conduct

28.     Plaintiff further alleges that Defendants commercially exploited the recording titled "Feliz Navidad" connected to Plaintiff's catalog and performances, and that Defendants altered or routed credits and metadata such that the public listings and artist attribution did not accurately reflect Plaintiff's role, while Defendants retained the resulting revenue streams.

29.     Plaintiff alleges that the "Feliz Navidad" recording includes Plaintiff's recorded performance for the majority of the recording's runtime and that Defendants nevertheless structured credits and listings in a manner that diverted royalties and attribution away from Plaintiff.

30.     Plaintiff alleges that Defendants have not paid Plaintiff the royalties and revenue associated with exploitation of "Feliz Navidad" despite continued monetization of the recording through digital distribution and catalog channels.

### F. Demand, Notice, and Continuing Conduct

31.     Plaintiff provided notice of claims and demanded correction, accounting, and resolution. See Exhibit A and related demand and notice materials within Plaintiff's exhibit set.

32.     Despite notice, Defendants continued exploitation of the catalog without providing Plaintiff with lawful credit, complete accounting, or the royalties and revenues derived from the exploitation.

## V. CLAIMS FOR RELIEF

## COUNT I — COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 106, 501)

## (Against All Defendants)

33.     Plaintiff realleges paragraphs 1 through 32 as if fully set forth herein.

34.     Plaintiff is the author and, at minimum, the beneficial owner of protectable copyrights in the works at issue, including the Donde Lo Conseguiste album and related recordings, as supported by public record registration data. **See Exhibits - U & V.**

35.     Defendants infringed Plaintiff's exclusive rights under **17 U.S.C. § 106** by reproducing, distributing, publicly performing, and otherwise exploiting Plaintiff's copyrighted works without authorization.

36.     Defendants' conduct constitutes infringement under **17 U.S.C. § 501.**

37.     Plaintiff never executed a written transfer of copyright ownership satisfying **17 U.S.C. § 204(a),** and Defendants cannot claim lawful ownership or transfer absent such a written instrument.

38.     As a direct and proximate result of Defendants' infringement, Plaintiff has suffered damages, and Defendants have gained profits attributable to the infringement.

39.     Plaintiff is entitled to actual damages and Defendants' profits under **17 U.S.C. § 504(b)** and injunctive and equitable relief under **17 U.S.C. § 502** and other applicable provisions.

## COUNT II — FALSE COPYRIGHT MANAGEMENT INFORMATION (DMCA, 17 U.S.C. § 1202)

### (Against All Defendants)

40.     Plaintiff realleges paragraphs 1 through 39 as if fully set forth herein.

41.     Defendants knowingly provided, altered, removed, and distributed false or misleading copyright management information ("CMI") in connection with Plaintiff's recordings and catalog, including but not limited to artist attribution, authorship credits, ownership identification, and metadata associated with digital distribution and monetization of Plaintiff's works.

42.     Such false or altered CMI appeared in digital metadata, platform listings, distributor feeds, and related catalog information controlling attribution and royalty routing, including in connection with the commercial exploitation of "Feliz Navidad" and other works associated with the Donde Lo Conseguiste album.

43.     Defendants acted with knowledge, or with reasonable grounds to know, that the provision, removal, or alteration of such CMI would induce, enable, facilitate, or conceal infringement by diverting royalties, obscuring Plaintiff's authorship and ownership, and frustrating Plaintiff's ability to detect and enforce his rights.

44.     Defendants' conduct violates **17 U.S.C. § 1202(a) and § 1202(b)** and entitles Plaintiff to remedies available under **17 U.S.C. § 1203**, including statutory damages, injunctive relief, and costs.

## COUNT III — DECLARATORY RELIEF (28 U.S.C. §§ 2201–2202)

### (Against All Defendants)

45.     Plaintiff realleges paragraphs 1 through 44 as if fully set forth herein.

46.     An actual controversy exists between Plaintiff and Defendants regarding Plaintiff's ownership and beneficial ownership interests, Defendants' infringement posture, and Defendants' distribution and metadata practices.

47.     Plaintiff seeks a declaration establishing Plaintiff's rights, Defendants' lack of lawful authorization absent a valid § 204(a) transfer, and Defendants' infringement posture as alleged.

## COUNT IV — ACCOUNTING AND DISGORGEMENT
## (17 U.S.C. § 504(b) and Equity)

### (Against All Defendants)

48.     Plaintiff realleges paragraphs 1 through 47 as if fully set forth herein.

49.     Defendants possess information uniquely within their control concerning revenues, distributor statements, platform analytics, royalty routing, licensing income, advances, and catalog revenue streams attributable to exploitation of Plaintiff's works.

50.     Plaintiff seeks an accounting and disgorgement of profits attributable to Defendants' exploitation of Plaintiff's works and related catalog.

## COUNT V — UNJUST ENRICHMENT (28 U.S.C. § 1367)

## (Against All Defendants)

51.      Plaintiff realleges paragraphs 1 through 50 as if fully set forth herein.

52.      Defendants were unjustly enriched through conduct independent of copyright infringement, including unauthorized commercial use of Plaintiff's name, stage identity, and brand goodwill, false attribution practices, deceptive royalty-routing mechanisms, and exploitation of Plaintiff's identity while Plaintiff was incarcerated, resulting in benefits to Defendants beyond mere reproduction or distribution of copyrighted works.

53.      It would be inequitable for Defendants to retain the resulting benefits without restitution to Plaintiff.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Jaime A. Davidson, Plaintiff, **pro-se**, respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants, and award:

54.      A declaration that Plaintiff is the author and, at minimum, beneficial owner of the works at issue and that Defendants lacked lawful authorization absent a valid written transfer under **17 U.S.C. § 204(a).**

55.      Preliminary and permanent injunctive relief prohibiting further infringement and requiring correction of attribution and catalog metadata as appropriate.

56.      An order requiring Defendants to render a full accounting of all revenues derived from exploitation of Plaintiff's works and related catalog.

57.      An award of actual damages and Defendants' profits under **17 U.S.C. § 504(b).**

11

58.     **DMCA** remedies under **17 U.S.C. § 1203**, including statutory damages and injunctive relief.

59.     Costs and such other relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

60.     Plaintiff demands a trial by jury on all issues so triable.

**Signed on this** _____8_____ **day of** _F e b r u a r y_____, **2026.**

Respectfully submitted,

**Jaime A. Davidson, Pro-Se.**
**p/k/a "Gringo," "Gringo El Original," "Gringo Man"**
10226 Curry Ford Road, Suite 107-91
Orlando, Florida 32825
**Tel: (407) 496-0809**
**Email: jadavidson1610@gmail.com**

# CERTIFICATE OF SERVICE

I, Jaime A. Davidson, Plaintiff, **pro-se**, **HEREBY CERTIFY** that a true and correct copy of the foregoing,

**COMPLAINT FOR COPYRIGHT INFRINGEMENT, FALSE COPYRIGHT MANAGEMENT INFORMATION (DMCA), DECLARATORY RELIEF, ACCOUNTINGAND DISGORGEMENT, AND UNJUST ENRICHMENT (JURY TRIAL DEMANDED), WITH ATTACHED EXHIBITS A – U.**

have been served on all interested parties via, USPS Priority Mail and/or email to the following addresses below:

**Juan Hidalgo, President**
**J&N Records, Inc. / J&N Music Group**
**10400 NW 37th Terrace**
**Miami, FL 33178**

**Marti Cuevas, President Mayimba Music, Inc.**
**24 White Birch Drive**
**Pomona, NY 10970**

**The Orchard Enterprises, Inc.**
**Attn: Rights and Legal Department**
**23 East 4th Street, 3rd Floor**
**New York, NY 10003**

**Sony Discos Inc. / Sony Music Latin**
**605 Lincoln Road, Suite 7**
**Miami Beach, FL 33139**

**Sony Music Entertainment US Latin LLC**
**3390 Mary Street, Suite 220**
**Coconut Grove, FL 33133**

Signed on this ___8___ day of ___February___, 2026.

Respectfully submitted,

/s/ _Jaime A. Davidson_

Jaime A. Davidson, Plaintiff, Pro-Se.
10226 Curry Ford Road, Suite: 107-91
Orlando, Florida 32825
Email: jadavidson1610@gmail.com
Phone: (407) 496-0809

# Plaintiff's Exhibit List A Thru V Format

## Label, Description, then "What this exhibit supports."

**Exhibit – A:**

**Description:**

Demand letter dated December 5, 2025, from Jaime A. Davidson to J&N Records, Mayimba Music, The Orchard, and Sony entities regarding "Donde Lo Conseguiste" and related recordings.

**What this exhibit supports:**

Pre-suit notice and opportunity to cure before litigation.

Willfulness: J&N and co-defendants were explicitly told of the missing contract, chain-of-title problems, and unauthorized exploitation yet continued monetizing.

Confirms delayed authorship, incarceration timeline, and the masters/royalties dispute in your own words.

Supports declaratory relief, copyright infringement, fraud, unjust enrichment, and enhanced damages for willful conduct.

**Exhibit – B:**

**Description:**

Email thread between attorney Stephen Nale and Marti Cuevas (Mayimba Music) about your royalties, J&N's buy-out theory, digital monetization, and the YouTube video falsely labeling "Magic Juan x Gringo Man."

**What this exhibit supports:**

Direct admission that J&N (through Mayimba) is monetizing your catalog via digital distribution (The Orchard, Content ID) while claiming a "$15,000 buyout" and no royalties owed.

Confirms lack of signed agreement in Mayimba's files and their reliance on a supposed historical contract they cannot produce.

Shows actual knowledge of the YouTube video with "Gringo Man" and that they chose to leave it monetized.

1

Supports copyright infringement, accounting/royalty claims, fraud/misrepresentation, and willfulness.

**Exhibit – C:**

**Description:**

Sony Discos / industry article showing J&N Records as an independent tropical/dance label and distributor linked with Sony Discos for distribution.

**What this exhibit supports:**

J&N's role as your label and its commercial relationship with Sony.

Confirms that J&N had the ability and infrastructure to distribute and monetize the album through a major record label.

Supports chain-of-title narrative and shows this was a commercial venture, not a hobby or "minimal sales" project (undercutting the "pennies" narrative).

**Exhibit – D:**

**Description:**

BMI correspondence acknowledging your inquiry and clarifying the handling of your performance royalties.

**What this exhibit supports:**

Confirms your status as the performing and/or songwriting artist associated with DLC.

Shows you actively sought information and accounting; you were not asleep on your rights.

Supports authorship, identity, and your diligence in pursuing royalty information.

**Exhibit – E:**

**Description:**

Your 2007 thank-you/gratitude letter to Tony Moreno / J&N, sent while incarcerated, referencing their prior response and enclosing prior letters and a Don Francisco letter.

**What this exhibit supports:**

Timeline of your imprisonment and communications with J&N while you had no practical control over the exploitation of the album.

Good faith attempts to resolve issues and obtain help, demonstrating reliance and trust.

Supports tolling / equitable arguments: you weren't positioned to litigate; you were working through letters while in custody.

**Exhibit – F:**

**Description:**

Letter from J&N (Tony Moreno) stating they are "looking for the masters" of "Donde Lo Conseguiste" and will "proceed accordingly" once found.

**What this exhibit supports:**

Critical admission that J&N did not have clear, organized control and documentation of your masters decades later.

Inconsistent with a clean early-1990s "full buyout" with proper paperwork; if they owned everything cleanly, they wouldn't be "looking for the masters."

Supports the attack on the forged "Purported Agreement," the lack of contract under § 204(a), and fraud/unjust enrichment theories.

**Exhibit – G:**

**Description:**

Sony royalty/accounting statement and J&N internal "Funds paid to Gringo" breakdown (the $17,000 expense narrative).

**What this exhibit supports:**

Business records showing real sales/returns and money flowing through J&N for your album.

J&N's own accounting story: how much they claim to have spent vs. what they say you received—central to their "recoupment" and "no royalties owed" narrative.

Supports damages, disgorgement, and shows that exploitation was commercially meaningful, not trivial.

Also supports your correction that the total production cost was higher, and that the $20K advance (in $5K chunks) was not the full album cost.

3

**Exhibits: H-1 to H-4:**

**Description:**

Certified excerpts of federal trial transcripts with testimony by Juan Hidalgo and others about your music, DLC, and the early 1990s industry context.

**What this exhibit supports:**

Sworn, third-party testimony confirming your identity, your role in the recordings, and the historical reality of your career.

Corroborates your story that you were incarcerated while J&N continued exploiting your work.

Provides independent evidence of your authorship, timeline, and the environment J&N operated in.

**Exhibit – I:**

**Description:**

1992 Word Up magazine article mentioning you ("Gringo") alongside other Latin rap/reggae artists, referencing a Sony record deal and positioning you within the early Spanish rap/reggae movement.

**What this exhibit supports:**

Contemporaneous press confirming your identity, branding, and market positioning in the early 1990s.

Shows you were marketed with Sony and others, not as some unknown basement act.

Supports your right-of-publicity / false endorsement angle (who the public understood "Gringo" to be).

**Exhibit – J:**

**Description:**

"Gringo El Original" / "Gringo Man" Wikipedia biography page printout, summarizing your career, discography, and cultural contribution.

**What this exhibit supports:**

Modern, public-facing description of who "Gringo / Gringo Man" is, reinforcing your established identity.

4

Provides background context for the court and jury about your standing in Reggaeton / Spanish Reggae History.

Helps frame damages and reputation harm when others were pushed out under your name.

**Exhibit – K:**

**Description:**

Library of Congress copyright registration logs for "Donde Lo Conseguiste" showing:

SR0000148750 (1992) — musical work registration, claimant: J&N Records, "on words, music; employer for hire."

SR0000175459 (1993) — sound recording registration, claimant: J&N Records, "on recording and artwork; employer for hire."

**What this exhibit supports:**

Direct proof that J&N registered your work behind your back, falsely designating themselves as "Employer for Hire."

Supports your § 411(b) argument that knowingly inaccurate information was included in registrations.

Backs your claim that you never agreed to be an employee, never signed a work-for-hire deal, and were incarcerated when these entries were made.

Critical for declaratory relief to correct the registrations and for fraud/misrepresentation theories.

**Exhibit – L:**

**Description:**

"Recording Agreement" produced by J&N after your release from prison, allegedly signed by you, dated August 9, 1990 (background date), plus the later letter "releasing" you to record an LP by phone from prison.

**What this exhibit supports:**

The heart of the forgery / unconscionability theory: the document's date is impossible (you didn't know J&N in 1990), and the terms are retrofitted after-the-fact.

Demonstrates J&N's attempt to retroactively paper over decades of unauthorized exploitation once they realized you were now home and free from prison.

The "release to record by phone" letter shows they treated you as already bound to them, even

while you were incarcerated, without any valid contemporaneous agreement.

Core evidence for declaratory relief voiding the "Purported Agreement."

**Exhibit: L-1:**

**Description:**

Affidavit of Jaime A. Davidson (aka "Gringo," "Gringo El Original," and/or "Gringo Man").

**What this exhibit supports:**

Your sworn personal narrative of the recording sessions, the deal that never happened, prison timeline, J&N's conduct, the fake contract, and the impersonation scheme.

Sets out tolling facts: incarceration, lack of access, reliance on representations, efforts to resolve.

Provides a detailed, sworn roadmap that the other exhibits plug into.

**Exhibit: L-2 (UPDATED):**

**Description:**

**Declaration of Omar Antonio Pacheco Bonilla (28 U.S.C. § 1746)** regarding impersonation and use of the "Gringo / Gringo Man" identity in connection with J&N's exploitation/marketing.

**What this exhibit supports:**

Confirms that another performer was put out as "Gringo / Gringo Man" performing Plaintiff's songs on behalf of J&N/its associates.

Backs your right-of-publicity, false endorsement, and consumer confusion claims: the public saw someone else presented as you.

Shows J&N and their agents knew exactly what they were doing by using your name with a different body/face.

Supports willfulness, deception, and injunctive relief to stop misattribution.

**Exhibit – M:**

**Description:**

YouTube Studio screenshot and related data for the "Donde Lo Conseguiste" Reggaeton video labeled "Gringo Man & Magic Juan," using a photo of Omar Pacheco, plus associated Spotify playlist / Spotify Hits screenshot.

**What this exhibit supports:**

Shows that user-facing content used the wrong face ("Gringo Man" image = Omar) tied to
Plaintiff's song, creating confusion and false endorsement.

Confirms J&N/The Orchard are monetizing that content via Content ID (asset ID, ISRC, UPC,
"artist Gringo," "label J&N Records," and "asset owner The Orchard").

Supports Lanham Act false designation / false endorsement, DMCA misrepresentation theories,
and ongoing infringement / unjust enrichment.

**Exhibit – N:**

**Description:**

Letter from attorney Sandra E. Roper (1996) to J&N requesting contracts signed between
J&N/J&N Distribution and Jaime Davidson, and full royalty sales/accounting documentation.

**What this exhibit supports:**

Shows you retained counsel as early as 1996 to chase contracts and accounting—Mr. Davidson
wasn't sleeping on his rights.

Puts J&N on formal notice decades ago that Mr. Davidson wanted contracts and royalty
information.

Supports tolling and shows J&N's failure/refusal to produce a valid signed agreement.

**Exhibit – O:**

**Description:**

Letter from Marti Cuevas to Sandra Roper (April 4, 1996) enclosing mechanical statements from
Sony, describing "minimal sales," and stating they have never received a royalty statement from
Sony.

**What this exhibit supports:**

J&N's own administrator admits to having problems with Sony's accounting and their inability
to produce full records.

Concedes that mechanicals exist and shows a revenue trail, even while they downplay sales.

Supports your demand for a full accounting and shows long-standing documentation gaps and
inconsistencies.

**Exhibit – P:**

**Description:**

Second letter from Marti Cuevas to Sandra Roper enclosing an unsigned draft of a contract between "Gringo" and J&N, plus comments about your early career, advances, production trip to Jamaica, and the Rama Yama / "Rama Jama" side deal.

**What this exhibit supports:**

Critical admission: they only had an unsigned draft in 1996—no executed copy in Marti's files.
Blows up the story that there was a clean, signed buyout in the early 1990s.
Shows they were able to produce signed contracts for other deals (Rama/Jamaica / Masters at Work), but not for you.
Supports fraud, spoliation / fabrication arguments, and your chain-of-title theory.

**Exhibit – Q:**

**Description:**

Contract for Masters at Work / "Rama Jama" production, reflecting J&N's involvement and the separate licensing/advance structure with Cut Records/Masters at Work.

**What this exhibit supports:**

Shows J&N's ability to generate and preserve proper contracts for other artists/projects at the same time.
Highlights the contrast: if they could keep that contract, why is your supposed contract missing in 1996 and suddenly appearing decades later?
Supports fraud, spoliation / fabrication arguments, and your chain-of-title theory.

**Exhibit – R:**

**Description:**

Plaintiff's April 17, 1996 letter to Sandra Roper enclosing royalty computation comparisons and additional documents about your musical status.

**What this exhibit supports:**

Shows you actively participated in analyzing royalties and comparing J&N's statements vs. reality.

Supports the story of damages: there is a concrete dispute about money, not just feelings.
Adds to your diligence and supports equitable arguments against limitations defenses.

**Exhibit – S:**

**Description:**

Vinyl 12" single of "Donde Lo Conseguiste" released by J&N Records (single version, J&N label).

**What this exhibit supports:**

Physical proof that J&N exploited your songs as singles, not just as an album.
Undercuts any attempt to minimize exploitation by focusing only on one "album" line item.
Supports Mr. Davidson's claim that J&N chopped up the album and sold tracks as singles without proper accounting.

**Exhibit – T:**

**Description:**

CD (or disc) of the "Donde Lo Conseguiste" album with artwork and bonus hip-hop track with Magic Juan.

**What this exhibit supports:**

Physical confirmation of the album as marketed to the public, including cover art and track listing.
Shows the project was a fully realized commercial product with bonus track and features (not a low-value demo).
Supports both copyright infringement (sound recordings and compositions) and right-of-publicity / branding issues.

**Exhibit – U:**

**Description:**

**Unofficial Certificate Preview** for **Registration SR0001054582** (effective **January 26, 2026**), reflecting the information that will appear on the official certificate currently en route.

**What this exhibit supports:**

Confirms the completed registration details tied to SR0001054582 for pleading posture,

standing, and remedies analysis.

Supports your ownership/registration allegations and strengthens the "no signed transfer" and chain-of-title narrative.

Supports plausibility and willfulness framing at the pleading stage, and supports relief requiring correction of registrations/attribution.

**Exhibit – V:**

**Description:**

U.S. Copyright Office **Public Records printout** for **SR0001054582**, confirming claimant information, titles, and "Publisher Label Number: J&N Records."

**What this exhibit supports:**

Independent government public record corroboration of registration data relevant to ownership, claimant assertions, and label/publisher association.

Supports declaratory relief and correction of records, and supports the allegation that J&N publicly positioned itself as claimant/label on the registration record.

Supports your notice, willfulness, and chain-of-title arguments and strengthens the request for accounting and corrective relief.

**JAIME A. DAVIDSON SR.**
p/k/a "Gringo" / "Gringo El Original" / "Gringo Man"
**Gringo Man Enterprise, LLC**
10226 Curry Ford Road, Suite 107-91
Orlando, Florida 32825
Phone: (407) 496-0809
Email:

**December 5, 2025**

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**AND EMAIL**

**Juan Hidalgo, President**
J&N Records, Inc. / J&N Music Group
10400 NW 37th Terrace
Miami, FL 33178

**cc:**

**Marti Cuevas, President**
Mayimba Music, Inc.
24 White Birch Drive
Pomona, NY 10970

**The Orchard Enterprises, Inc.**
**Attn: Rights and Legal Department**
23 East 4th Street, 3rd Floor
New York, NY 10003

**Sony Discos Inc. / Sony Music Latin**
605 Lincoln Road, Suite 7
Miami Beach, FL 33139

**Sony Music Entertainment US Latin LLC**
3390 Mary Street, Suite 220
Coconut Grove, FL 33133

**RE: Demand for Accounting, Documentation of Chain of Title, and Settlement of Claims**
**Regarding the Album "Donde Lo Conseguiste" and Related Recordings**

Dear Mr. Hidalgo:

I am writing regarding the album commonly known as ***Donde Lo Conseguiste*** and related recordings that I created and performed in or about 1991–1992. J&N Records has exploited these recordings for more than three decades without producing any valid recording agreement, without

1



demonstrating a clean chain of titles, and without providing contractually or statutorily compliant royalty statements. This letter serves as a formal demand for immediate correction of records, full accounting, chain-of-title documentation, and pre-litigation settlement. If this matter is not resolved within thirty (30) days, I intend to file a federal civil action seeking full damages, disgorgement of profits, statutory damages where available, attorneys' fees, and all other relief permitted under federal and state law against **J&N, Mayimba Music, The Orchard, and Sony.**

## I. FACTUAL SUMMARY

In 1991–1992, I recorded the master's that became the ***Donde Lo Conseguiste*** **Album** and delivered a reference **DAT Tape** to J&N for evaluation. J&N chose to proceed with the project as a commercial release. At no point during or after this process did J&N present a valid, contemporaneously executed written recording agreement signed by me that would satisfy **17 U.S.C. § 204(a).** No such document has ever been produced.

On February 9, 1992, I was arrested and remained in federal custody. While I was unable to promote, supervise, or control the release of my recordings, J&N proceeded to exploit the album. In addition, I have obtained witness testimony that another performer was instructed to appear and perform under my stage name **"Gringo / Gringo Man"** in connection with the same catalog, which will support separate right-of-publicity and false-endorsement claims. In 1996, your office issued a letter acknowledging my status as an artist. On March 29, 2007, J&N, through Tony Moreno, issued a letter stating that J&N was **"looking for the masters of the 'Donde Lo Conseguiste' album/CD" and would "proceed accordingly"** once they were found. This admission is inconsistent with any claim of a valid early-1990s transfer of rights.

Sony administered the album for years under J&N's authority, and Sony's royalty records confirm commercial revenue. I was never provided with accurate royalty statements or complete accounting for physical sales, digital downloads, licensing, or other uses.

In or about 2019, the album was re-released and monetized across major streaming platforms. J&N and/or its administrators filed ownership claims through Content ID registrations and digital-rights systems. When my entertainment counsel contacted Mayimba Music, Mayimba admitted it could not produce any signed recording agreement or adequate accounting records, yet exploitation of my catalog continued.

The factual assertions in this letter are supported by contemporaneous documents, including the 1996 letter, the March 29, 2007 "lost masters" letter, Sony accounting pages, Mayimba email correspondence, and digital-platform screenshots. These materials will be filed with the complaint and early motions should litigation become necessary. **These factual assertions will be supported by sworn affidavits and contemporaneous documents, which I intend to file with the complaint if this matter is not resolved.**

## II. LEGAL LIABILITY

Under **17 U.S.C. § 204(a),** any transfer of copyright ownership is invalid without a written instrument signed by the owner. J&N has never produced such a document. All commercial exploitation of my masters for more than thirty years has therefore been unauthorized.

Your conduct also constitutes copyright infringement and improper royalty treatment. In *F.B.T. **Productions, LLC v. Aftermath Records**,* the Ninth Circuit held that digital uses require enhanced royalty treatment even where a valid contract exists. Your position is significantly weaker because no valid contract exists.

Your actions also create liability under the **Lanham Act, 15 U.S.C. § 1125(a),** for false designation and false endorsement, and under the **Digital Millennium Copyright Act, 17 U.S.C. § 512(f),** for knowing misrepresentations in platform ownership claims. Additionally, contradictory statements about contracts, masters, and accounting support claims for fraud, conversion, and unjust enrichment.

## III. SETTLEMENT POSITION

Based on the available evidence, I am confident that a jury could reasonably award many millions of dollars in damages and disgorgement. Even a conservative valuation of historically verifiable revenues places exposure in the twenty- to twenty-five-million-dollar range before statutory damages, interest, attorneys' fees, and any punitive components.

Before litigation, I am willing to consider a global settlement of fifty million dollars ($50,000,000), together with: **(a) written acknowledgment of my authorship and artist identity; (b) delivery of all extant masters, stems, artwork, and related materials; and (c) a mutually acceptable framework for future exploitation. Any settlement must include full accounting and written documentation.**

Within the same thirty (30) day period, please also produce: (1) all recording, licensing, administration, or assignment agreements under which you claim rights to my masters; (2) all assignments, side letters, or sublicensing agreements involving Sony, The Orchard, Mayimba, or any other third party in connection with my recordings; and (3) a full royalty accounting from initial release through the present, including physical, digital, streaming, and licensing revenues.

If you decline to negotiate in this range or fail to provide the requested documentation, I will file suit without further notice, seeking damages under federal copyright law, the Lanham Act, the DMCA, fraud, conversion, unjust enrichment, and related causes of action.

## IV. LITIGATION HOLD AND DOCUMENT PRESERVATION

Effective immediately, **J&N, Mayimba, The Orchard, and Sony MUST** preserve all documents, contracts, communications, royalty files, chain-of-title records, Content ID filings, and digital registrations related to my works. Any destruction or alteration after receipt of this notice may constitute spoliation of evidence.

## V. DEADLINE

Please have your legal counsel contact me within thirty (30) days of this letter to confirm your willingness to negotiate and to arrange production of the requested documents and accounting. Failure to provide a timely and substantive response will be treated as refusal, and I will proceed with litigation.

Nothing in this letter waives or limits any of my rights.

Sincerely,

/s/ Jaime A. Davidson

Jaime A. Davidson, Sr.
**p/k/a "Gringo," "Gringo El Original," "Gringo Man"**

**Cc: Mr. Stephen Nales, Esq.**
　　 **Mrs. Bettina Schein, Esq.**

4

Fwd: Jaime Davidson "Gringo el Original" Royalties

Inbox

**Stephen Nale <srsnale@gmail.com>**                                          Tue, Jun 8,
                                                                              2021, 5:05 PM

to me, Bettina

Hi Jaime,

Please see the below response from Marti at Mayimba Music - JN Records' third party royalty
administrator.

I will forward the summary of earnings (as referenced in the below email) once received.

I suggest that we request a copy of the agreement that you signed with J&N as that will verify
Marti's assertion that the agreement was a buy-out with no record royalty due to you. In the event
that you are due a royalty per the agreement, we would need to see revenue earned in excess of
J&N's costs incurred in connection with the album in order for you to be fully recouped
and record royalties payable. Solely with respect to the 2019 re-release, the combined ~3000
streams on Spotify alone likely will not generate enough revenue to recoup the cost to distribute
your album to Spotify (Spotify pays approximately $1 per 1500 streams).

With respect to mechanical royalties and publishing, Marti asserts that you were paid out in full
with J&N not retaining any amounts. Do you have any record of "Juan and Nelson constantly
giving your family money"?

Marti mentions that Juan asked you to call him - is this something you are open to? Given their
position in the industry, there may be some solid business opportunities with them going forward
and this time we will make sure you are adequately protected and all revenue is accounted for.
Nevertheless, she provided Juan's number for you to reach out - 786 402-8612.

EX. B

Once you have had a chance to review Marti's response, please contact me to discuss how you would like to move forward.


Best,

Stephen


---------- Forwarded message ---------
From: **Marti Cuevas** < >
Date: Mon, Jun 7, 2021 at 4:21 PM
Subject: Re: Jaime Davidson "Gringo el Original" Royalties
To: Stephen Nale < > .


Hi Stephen,


The physical album DONDE LO CONSEGUISTE was released in 1990 under an agreement with Sony.  Sony returned 7,000 units and J & N cut it out.   In 2019, J & N released the album digitally.  I have requested an accounting, even though there are no royalties provided for under the royalty agreement - it was a $15,000 buyout.   I do not believe J & N retains records of physical sales from 1990, but I am asking them to check physical files - I only have access to the digital server as I am in NY.


I was not working with J & N when the agreement with Jaime was signed, or when J & N signed the 1990 deal with Sony for Gringo and two other artists.  However,  I started with them in 1991 and continue to this day.


J & N is an indie Hispanic label with a patrimonial bent.  I recall clearly that Juan & Nelson constantly gave money to Gringo's family, and 100% of everything that was generated on publishing was paid out, without J & N retaining a penny.


Even though there are no royalties due under the recording agreement, I have asked accounting to provide a summary of earnings.  However, just looking around one can surmise the digital release of the record has generated pennies.  Attached is a screenshot from Spotify showing a maximum of 1,600 views on some of the songs, and zero on others.

Gringo went on a talk show recently with EL ,MOLUSCO, and erroneously claimed J & N hired an artist named "Gringo Man" to replace him.  He apparently got this idea from this video of DONDE LO CONSEGUISTE on YouTube:

In this instance, a third party user provided the video and named it Magic Juan x Gringo Man.   There was indeed a remix version made of the song, but it was Gringo feat. Magic Juan. J & N also released this remix digitally in 2019 - it is track 9 on the album.   As to the video, I can write to the user and ask him to amend the artist name.

J & N would not be aware of User Generated Content unless a conflict arises, and this particular video was detected by our digital distributor and is being monetized by J & N  - but the video being claimed is the original DONDE LO CONSEGUISTE by Gringo.  (see screenshot) and not the remix.   The last two digits of the ISRC code for the remix are 32.

Juan has asked that Gringo call him.   I don't understand why he doesn't.......  Juan's number is 786 402-8612.

Best regards,

Marti

On Mon, Jun 7, 2021 at 2:39 PM Stephen Nale < _____ > wrote:

Hi Marti,

I am entertainment counsel for Jaime Davidson. I received your contact information from the receptionist at JN Music Group upon my inquiry into royalties due to my client.

Mr. Davidson signed as a recording artist to JN Records in the early 1990's and
JN Records released my client's first album entitled "Dondo Lo Conseguiste" (the "Album") in
1992. Since the release of the Album and various singles (the "Singles" and together with the
Album, collectively, the "Recordings") on JN Records, my client has received only two royalty
statements, both of which were sent to my client in the early 1990's. Nevertheless,
JN Records has continued to exploit the Recordings without payment to my client of
any record royalties or mechanical royalties. See attached screenshots.

Accordingly, I hereby request you provide a complete, accurate and detailed written accounting
in connection with all commercial exploitations of the Recordings (both master recordings and
the musical compositions embodied thereon), including, without limitation, a detailed report of
the number of units of the Recordings that JN Records has manufactured, shipped and sold to
date, including all digital exploitations thereof.

Please contact me immediately if you have any questions at ~~............~~ or 860-418-
9603.

Nothing contained herein or omitted herefrom shall be deemed to be an admission of any facts or
a waiver of any rights or remedies, at law or in equity, with respect to the subject matter hereof,
all of which rights and remedies are hereby expressly reserved.

Best,

Stephen Nale

--

**Marti Cuevas**

**President**

**Mayimba Music, Inc.**

24 White Birch Drive

Pomona, NY 10970



≡   ✉ Gmail              🔍  recording contract                                          ✕   ⚙

         Compose                              ✉

Mail                         Fwd: Jaime Davidson "Gringo el Original" Royalties   Inbox ×
         Inbox        12,322
Streak   Starred                  Stephen Nale <srsnale@gmail.com>
         Snoozed                  to me, Bettina
Chat     Sent                     Hi Jaime,
      🖂  Recently Viewed
Meet                              Please see the below response from Marti at Mayimba Music - JN Records' third party royalty administrator.
      👁  All Tracked Emails
      ↩  Awaiting Reply           I will forward the summary of earnings (as referenced in the below email) once received.
         Drafts          412
                                  I suggest that we request a copy of the agreement that you signed with J&N as that will verify Marti's assertion that the agree
         Purchases        57      you are due a royalty per the agreement, we would need to see revenue earned in excess of J&N's costs incurred in connect
         More                     royalties payable. Solely with respect to the 2019 re-release, the combined ~3000 streams on Spotify alone likely will not gen
                                  Spotify (Spotify pays approximately $1 per 1500 streams).
    Labels
                                  With respect to mechanical royalties and publishing, Marti asserts that you were paid out in full with J&N not retaining any am
         [Gmail]Trash             your family money"?

                                  Marti mentions that Juan asked you to call him - is this something you are open to? Given their position in the industry, there
                                  this time we will make sure you are adequately protected and all revenue is accounted for. Nevertheless, she provided Juan's

                                  Once you have had a chance to review Marti's response, please contact me to discuss how you would like to move forward.

                                  Best,
                                  Stephen


                                  ---------- Forwarded message ---------
                                  From: Marti Cuevas <                        >
                                  Date: Mon, Jun 7, 2021 at 4:21 PM
                                  Subject: Re: Jaime Davidson "Gringo el Original" Royalties
                                  To: Stephen Nale <                      >


                                  Hi Stephen,

                                  The physical album DONDE LO CONSEGUISTE was released in 1990 under an agreement with Sony.  Sony returned 7,000
                                  have requested an accounting, even though there are no royalties provided for under the royalty agreement - it was a $15,00
                                  1000, but I am asking them to check physical files. I only have access to the digital power as I am in NY.

1/4/26, 1:54 PM
Case 1:26-cv-20836-EAL   Document 1   Entered on FLSD Docket 02/09/2026   Page 34 of 88
Fwd: Jaime Davidson "Gringo el Original" Royalties - jadavidson1610@gmail.com - Gmail



≡   Gmail          🔍  recording contract                                                      ✕   ⚙

Compose                                        ✉

Mail

Inbox            12,322          **From: Marti Cuevas** <                    >
                                Date: Mon, Jun 7, 2021 at 4:21 PM
Streak          Starred          Subject: Re: Jaime Davidson "Gringo el Original" Royalties
                Snoozed          To: Stephen Nale <                        >
Chat
                Sent             Hi Stephen,
Meet    👁  Recently Viewed
                                 The physical album DONDE LO CONSEGUISTE was released in 1990 under an agreement with Sony.  Sony returned 7,000
        👁  All Tracked Emails    have requested an accounting, even though there are no royalties provided for under the royalty agreement - it was a $15,00
        ↩  Awaiting Reply        1990, but I am asking them to check physical files - I only have access to the digital server as I am in NY.

                Drafts    412     I was not working with J & N when the agreement with Jaime was signed, or when J & N signed the 1990 deal with Sony for
                Purchases   51    continue to this day.
                More
                                 J & N is an indie Hispanic label with a patrimonial bent.  I recall clearly that Juan & Nelson constantly gave money to Gringo's
        Labels                    paid out, without J & N retaining a penny.

                [Gmail]Trash      Even though there are no royalties due under the recording agreement, I have asked accounting to provide a summary of ea
                                 of the record has generated pennies.  Attached is a screenshot from Spotify showing a maximum of 1,600 views on some of

                                 Gringo went on a talk show recently with EL ,MOLUSCO, and erroneously claimed J & N hired an artist named "Gringo Man"
                                 LO CONSEGUISTE on YouTube:


                                 In this instance, a third party user provided the video and named it Magic Juan x Gringo Man.  There was indeed a remix ver
                                 released this remix digitally in 2019 - it is track 9 on the album.  As to the video, I can write to the user and ask him to amend

                                 J & N would not be aware of User Generated Content unless a conflict arises, and this particular video was detected by our c
                                 claimed is the original DONDE LO CONSEGUISTE by Gringo.  (see screenshot) and not the remix.  The last two digits of th

                                 Juan has asked that Gringo call him.  I don't understand why he doesn't.......  Juan's number is 786 402-8612.

                                 Best regards,

                                 Marti

                                 On Mon, Jun 7, 2021 at 2:39 PM Stephen Nale <                > wrote:
                                    Hi Marti,

≡    ⌄ Gmail      🔍   recording contract       ✕   ⇄

Compose

Mail

Inbox      12,322

Streak    Starred

Snoozed

Chat     Sent

🖂   Recently Viewed

Meet    👁   All Tracked Emails

↩   Awaiting Reply

Drafts      412

Purchases     57

More

Labels

[Gmail]Trash



Marti

On Mon, Jun 7, 2021 at 2:39 PM Stephen Nale <         > wrote:
Hi Marti,

I am entertainment counsel for Jaime Davidson. I received your contact information from the receptionist at JN Music Grou

Mr. Davidson signed as a recording artist to JN Records in the early 1990's and JN Records released my client's first albur
the release of the Album and various singles (the "Singles" and together with the Album, collectively, the "Recordings") on
which were sent to my client in the early 1990's. Nevertheless, JN Records has continued to exploit the Recordings withou
attached screenshots.

Accordingly, I hereby request you provide a complete, accurate and detailed written accounting in connection with all comr
musical compositions embodied thereon), including, without limitation, a detailed report of the number of units of the Recor
including all digital exploitations thereof.

Please contact me immediately if you have any questions at      or 860-418-9603.

Nothing contained herein or omitted herefrom shall be deemed to be an admission of any facts or a waiver of any rights or
of which rights and remedies are hereby expressly reserved.

Best,
Stephen Nale

—
Mayimba

Marti Cuevas
President
Mayimba Music, Inc.

23 White Birch Drive
Batavia, NY 10940

www.mayimbamusic.com

3 Attachments · Scanned by Gmail      ⬇   ⊕ Add all to Drive

☰  ⌄ Gmail          🔍  recording contract                    ✕  ⚙

Compose

**Mail**                                    ✉

            **Inbox**            12,322
**Streak**  Starred
            Snoozed                              Mayimba
**Chat**    Sent                                 Marti Cuevas
                                                 President
         📭 Recently Viewed                      Mayimba Music, Inc.
**Meet**  👁 All Tracked Emails
                                                 24 Valley Brook Drive
         ↩ Awaiting Reply                        Pomona, NY 10970

            **Drafts**              412
            **Purchases**           57          www.mayimbamusic.com
            More
                                    **3 Attachments** · Scanned by Gmail    ⤓   ◎ Add all to Drive
**Labels**

            [Gmail]Trash                        

                                                📄 spotify hits.pdf   📄 gringo man merg...   ▶

                                     13

                                    👤  **Gringo El Original Oficial** <gringoeloriginalofficial@gmail.com>
                                        to rsdv@me.com, me

                                    **3 Attachments** · Scanned by Gmail    ⤓   ◎ Add all to Drive

                                    📄 spotify hits.pdf   📄 gringo man merg...   📄 Gringo (Jaime Da...

# Sony Discos Links With J&N

MIAMI—Sony Discos has confirmed that the label has inked a sales and distribution agreement with J&N Records, an independent dance/tropical label and distributor based in New York.

The long-term deal—set to take effect in late August/early September—also calls for Sony to promote J&N acts in the western half of the U.S.

George Zamora, Sony Discos marketing VP, lauded the accord, saying, "J&N is a hot street label that we believe will realize even greater sales with our distribution network."

J&N president Juan Hidalgo agreed with Zamora, and added, "Our agreement with Sony allows us to penetrate markets that we ordinarily would be unable to reach."

JOHN LANNERT

EX. C



August 2, 2011

Dear Mr. Davidson,

I received your letter inquiring about the status of your performing royalties. Let me clarify some points to you.

1) BMI does not pay mechanical royalties that will be Juan & Nelson Publishing, you need to get touch with them.

2) You became a BMI member back in March 1998, since then you have not register one song at BMI therefore we do not know what you wrote, you or the publishing company that represents you needs to register those songs at BMI and if they get airplay then you will be paid by BMI.

If you have any question, please do not hesitate to contact me.

Best regards,

Partner/Pina



EX. D

Jaime A. Davidson
Reg. No. 37593-053 (D-105)
F.C.I. Lewisburg
P.O. Box - 1000
Lewisburg, PA. 17837

April 4, 2007

J&N Records
**Attn**: Mr. Tony Moreno
Manager
13400 NW 37th Terrace
Miami, FL. 33171
Tel. No. (305) 629-4440

RE: THANK YOU LETTER OF GRATITUDE

Dear Mr. Moreno:

Greetings to you and the family, and all J&N staff members in
the name of God.  Praying that this letter finds everyone in the
best of health and strenght.  How are you doing Mr. Moreno?  First
and foremost, I just want to introduce myself to you, my name is
Gringo (one of Juan's former artists).  We don't know each other
yet, but I humbly pray that we can build a great rapore in the
near future.

Mr. Moreno, I mainly wanted to tell you thanks a lot for
responding to my letter immediately.  Please, tell Juan I send my
regards and I also wanted to tell him thanks a lot for feeling my
pain and extending a helping hand.  I really and truly do honestly
appreciate all your support at J&N Records.

Moreover, please notify the secretary that I will be calling
sometime next week and if she could press - 5 on the dial tone to
accept my call.  Mr. Moreno, it's not a collect call, it's a
**"PRE-PAID CALL."**  I am paying on my side, but the system has a
recorder.  I would like to talk to you personally over the phone,
as the person Juan has placed to work with me.  And, I would like
to talk to Juan personally, so I could tell him thanks myself too.

Therefore, before I close this letter, I am enclosing a copy
of the letter I sent Juan so you could be familiar with my request.
I've also enclosed a letter that the office of "DON FRANCISCO
PRESENTA" mail me since July of 2006.  I would like to work with
you in the mean time getting my name back out to the public and
sending all my fans to: **www.myspace.com/freegringo**, so they could
know where the origin of the entire Reggaeton genre started and
who I am, and who (J&N Records), was behind me and this whole
genre back in the days.  If Juan didn't believe in me and my music,
a lot of what is out there today wouldn't have been out there for
all those generations that sprouted since my incarceration.

Thanks in advance for your time, assistance and earnest
consideration in this most pressing and sensitive matter at hand.
Please expect my call-- notifying your secretary to **press - 5.**  I
as always ...

                                                  Very truly yours,

cc: Mr. Juan Hidalgo

*EX.E*

1/4/26, 3:55 PM          GRINGO'S LEGACY: SIGNS WITH J & N RECORDS AND SONY DISCOS - FREE JAIME.A.DAVIDSON.sr. !



13490 NW 37th Terrace
Miami, FL 33178
Tel. 305 629 8880
Fax 305 629 8972

3/29/07

ATT: MR JAIME A DAVIDSON
REG NO. 37593-053 (D-105)
USP LEWISBURG
P O  BOX- 1000
LEWISBURG, PA. 17837

DEAR MR DAVIDSON

IN REGARDS TO YOUR LETTER, MR JUAN HAS TOLD US TO LOOK FOR THE
MASTERS AND SO FAR WE CAN'T FIND THEM , AS SOON AS WE DO , WE
WILL INFORM YOU AND PROCEED ACCORDINLY
REGARDS

TONY MORENO
MANAGER
J&N RECORDS , INC.

EX. F

X.

### SONY ROYALTY STATEMENT SHOULD REFLECT AS FOLLOWS:

1. TE VES BIEN BIEN

2. PASAPORTE PA MI CAÑON

3. MAMA

4. TINY WINY

5. MENEA PARA ARRIBA

6. MUJER LOCIONO

7. MI MORENA

8. DONDE LO CONSEGUISTE

9. DONDE LO CONSEGUISTE (REMIX)

### SONY ROYALTY STATEMENT ONLY REFLECTS AS FOLLOWS:

1. TE VES BIEN BIEN    $149.21
    TINY WINY       $149.21
              $298.42   FROM: 1/1/93 - 3/31/93

Royalty Statement should be read as follow:   $149.21
                                     x   9
                                1,342.89
$149.21 = Song Royalty Statement including publishing.
9 = Nine (9) songs in the Album.
If J & N deducts the Publishing, it would reflect half ($74.61).
ROYALTY = Sales of the Records.
Publishing = Money paid to Author of the song.
During the quarter of 1/1/93 - 3/31/93 Sony Royalty Statement  should
reflect the same for nine (9) songs; that goes for every quarter too.
*********************************************************************

2. DONDE LO CONSEGUISTE       $10.72
    DONDE LO CONSEGUISTE (REMIX)   $10.72
                            $21.44   FROM: 4/1/93 - 6/30/93

   $10.72 x 9 = $192.96

3. DONDE LO CONSEGUISTE       $26.04
    DONDE LO CONSEGUISTE (REMIX)   $26.04   FROM: 7/1/93 - 9/30/93
                            $52.08

   $26.04 x 9 = $468.72

4. DONDE LO CONSEGUISTE       $45.76
    DONDE LO CONSEGUISTE (REMIX)   $45.76
                            $91.52   FROM: 10/1/93 - 12/31/93

   $45.76 x 9 = $823.68

EXHIBIT (x).

EX. G

5. DONDE LO CONSEGUISTE          $54.47
   DONDE LO CONSEGUISTE (REMIX)  $54.47
                                 $108.94
   $54.47 x 9 = $980.46                    FROM: 1/1/94 - 3/31/94

6. DONDE LO CONSEGUISTE          $57.37
   DONDE LO CONSEGUISTE (REMIX)  $57.37
                                 $114.74
   $57.37 x 9 = $1,032.66                  FROM: 4/1/94 - 6/30/94

7. TE TES BIEN BIEN   $63.80                FROM: 7/1/94 - 9/30/94

   $63.80 x 9 = $574.20

8. DONDE LO CONSEGUISTE          $387.88
   DONDE LO CONSEGUISTE (REMIX)  $387.88
                                 $775.76
   $387.88 x 9 = $3,490.92                 FROM: 7/1/95 - 9/30/95

   All of DONDE LO CONSEGUISTE (REMIX) Royalties, half goes to  MAGIC
   JUAN; in other words, Gringo and Magic Juan are 50 and 50 on  that
   song.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## DATES OF MISSING ROYALTY STATEMENTS FROM SONY

1. 10/1/94 - 12/31/94

2. 1/1/95 - 3/31/95

3. 4/1/95 - 6/30/95

4. 7/1/95 - 9/30/95

5. 10/1/95 - 12/31/95

6. 1/1/96 - 3/31/96
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## FUNDS PAID TO GRINGO FOR ALBUM'S PRODUCTION

1. $1,000 Paid to Mr. Doo, Via Western Union to Jamaica for Album.

2. $600 Paid to Gringo Via Western Union to Jamaica for travel expense.

3. $1,000 paid to Gringo in advance for Album production.

4. $700 Paid to gringo as a Loan.

5. $4,500 Paid to Gringo for Mr. Doo (Producer) to finish Album.

6. $4,500 paid to studio for studio time.

7. $5,000 Paid to Gringo for Production of Album including Producer fee.

8. $500 Paid to Gringo as an advance for Album Production.

9. $17,800 was the overall J & N spent on the Production for Gringo's

   DONDE LO CONSEGUISTE ALBUM, that was then sold to SONY DISCOS  for

   an " UNKNOWN " amount of money, also agreeing to sign Gringo    to

   SONY DISCOS, without Gringo's knowledge, consent or/and signature.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## FUNDS PAID TO GRINGO FROM SONY'S ROYALTY STATEMENTS

1. $932.48 Paid to Shirley Davidson on 1/9/94, from the  Sony Royalty
   Statement of 1/1/93 - 3/31/93. The Sony Royalty Statement computa-
   tions reflect otherwise from J & N's computations.  Sony computa-
   tions reflect on this quarter " $1,342.89. "

2. $800 Paid to Mr. Irwin Blye (Private Investigator) on 11/9/95, from
   Sony's Royalty Statements of the quarters of 1/1/95 - 4/1/96. These
   Royalty Statements are unknown to artist and attorney, to calculate
   the funds belonging to Gringo.



L. DAVIDSON - CROSS

Page 2076

MR. LAIDLAW:  I have no further questions

1

of the lieutenant.  Thank you.

2

THE COURT:  Do you want to cross-examine

3

4 him?

5 CROSS-EXAMINATION BY MR. WALSH:

6   Q.  Did you go through Lackland Air Force Base for your basic

7 training?

8   A.  Yes, sir, for my basic training when I started out

9 enlisted in 1983, December 1983.

10          THE COURT:  Thank you very much.  Call

11 your next witness.

12          MR. LAIDLAW:  Your Honor, with the court's

13 permission, I call Mr. Juan Hidalgo at this time.

14          J U A N   H I D A L G O,

15 called as a witness and being duly sworn, testified as follows:

16 DIRECT EXAMINATION BY MR. LAIDLAW:

17   Q.  Good morning, sir.  In a nice loud voice could you tell

18 the jury your name, please?

19   A.  Juan Hidalgo.

20   Q.  Mr. Hidalgo, where do you live, sir?

21   A.  9508 125th Street.

22          THE COURT:  Push that away from you a

23 little bit.  I think it will be a little more clear.

24   A.  9508 125th Street, New York.

5   Q.  Mr. Hidalgo, can you tell the jury what you do for a

*EX. H-1*

1   living?

2        A.  I'm a record producer.

3        Q.  And how long have you been in the music industry?

4        A.  Twelve years.

5        Q.  And where is your business located, sir?

6        A.  Which one, because I have one -- I have a retail outlet,

7   a wholesale and a production company.

8        Q.  Well, where is your production company located?

9        A.  130 West 42nd Street.

10       Q.  And you produce records; is that correct?

11       A.  Yes.

12       Q.  You also own record stores; is that what you're saying?

13       A.  Yeah.  Yes.

14       Q.  And you act as an agent for various musical artists?

15       A.  Yes, I do.

16       Q.  What kind of music do you primarily deal in, sir?

17       A.  Hispanic music, Latin.

18       Q.  Is there any difference between Hispanic music and Latin

19   music?

20       A.  Well, we have different kind of music which we have the

21   each country we come from we have our own music.  Like where I

22   come from I have my own music, I do like Salsa.  Spanish is

23       Q.  And you represent various performers, would

24       A.  Yes.

25       Q.  Do you know Jaime Davidson?

Page 2078

A. Yes, I do.

1  Q. And can you tell the jury when did you first came to know

2  of him?

3  A. One day I was recording in a studio and we needed a small

4  part for a rapper in English, and the engineer was there doing

5  the record recording, he represented Jaime, so he came in and he

6  did the part and that's --

7  Q. When was that, sir?

8  A. That was in the summer of 1981, beginning the summer

   (CORRECTION)→ 1991

9

10 1981.

11 1991.  Q. And did he subsequently become one of your clients?

12 A. He came by me to the distributor and we started talking

13 about deals, dances that day, and by the end of summer we were

14 working something out.

15 Q. Mr. Hidalgo, have you recorded a record that Mr. Davidson

16 performed?

17 A. Yes.

18 Q. Okay.  And when was that done, sir?

19 A. That was done about at the end of the summer.

20 Q. Of which year?

21 A. 1991.

22 Q. And what's the title of the record?

23 A. Donde lo Consequista, Gringo.

24 Q. For those of us that don't remember our high school

25 Spanish, how would you translate that into English?

EX H3

1    A.  Where Will You Find It?

2    Q.  And does Mr. Davidson sing on all the cuts on that album?

3    A.  Yes, he does.

4    Q.  And which music corporation has cut that album?

5    A.  SONY Music.

6    Q.  SONY?

7    A.  SONY.

8    Q.  What type of music is on his record?

9    A.  It's Spanish reggae.  It's a rap song Spanish.

10   Q.  Are they raps?

11   A.  Yeah, rap.

12   Q.  Is there a difference between Spanish reggae and rap?

13   A.  Well, it's a little bit, it's similar to the American rap

14   in a way.

15   Q.  But it's in Spanish?

16   A.  But it's in Spanish.

17   Q.  I see.  And have you attempted to promote his album since

18   it was cut?

19   A.  Well, yes, I have attempted to do so, but I can do what I

20   do.

21   Q.  And I am going to show you at this time what we've

22   labeled as Defendants' Exhibit AK.  Do you recognize that?

23   A.  Yes, a poster.

24   Q.  Can you speak a little louder so that all the people can

25   hear you?

J. HIDALGO - DIRECT

A. Yeah, this is a poster that we do it for.          Page 3030

Q. That's a poster of who?

A. Gringo.

Q. And who is Gringo?

A. Davidson.

Q. Is that his nickname Gringo; on the album he is called Gringo?

A. Well, that's his artistic name.

Q. And this poster was produced to promote the record Gringo that he has made; is that correct?

A. Correct.

Q. Now, how many musical artists have you represented over the years, roughly?

A. I got over maybe about, about 17 albums active right now, so I mean recording, I have like 700.

Q. Mr. Hidalgo, in your opinion does Jaime Davidson have a bright future in the music industry?

A. In my opinion he does, otherwise a big company like SONY disco wouldn't pick up the reggae.

MR. LAIDLAW: Thank you. I have no further questions of this witness. I would like to offer into evidence at this time Defendants' AK.

MR. JAQUITH: No objection.

THE COURT: Received.

(Defendants' Exhibit AK received in

EILEEN McDONOUGH, R.P.R.
Official U.S. Court Reporter

J. HIDALGO - CROSS

evidence.)

CROSS-EXAMINATION BY MR. JAQUITH:

Q. Mr. Hidalgo, what's your relationship with Mr. Davidson as far as profits from his performances?

A. Well, I'm only recording. I mean profitable performance out of that I don't have.

Q. Excuse me, profits from recordings?

A. You cannot tell in the music business. If a record is not a hit, you have no profit.

Q. But assuming that some are sold, how do you get paid?

A. Well, I get paid for each album that is sold from the cost of the production, as far as you take off the cost, and then whatever you make after that.

Q. Well, I guess what I'm asking you, sir, is what's your arrangements concerning that? Do you get a percentage of each sale or do you get paid a flat rate or how do you get paid on Jaime Davidson's musical career?

A. I get paid like a flat rate for each record that's sold.

Q. Now, this SONY music that you spoke of, that's not the Japanese company that includes TV's and record players and that sort of thing, is it?

A. The same company, yes.

Q. Now, do you know who Mr. Davidson performs with, what other musicians and singers he performs with?

A. No, I don't know that.

Visionary: The Rise and Fall of the Reggaeton Man

J. HIDALGO - CROSS

Q. You don't know?

A. I don't know each other performer. The only one I know if he performed one time for my company.

Q. Just this one record?

A. For now.

Q. Never previously booked him into any clubs or entertainment halls or anything like that?

A. We did a promotional presentation one time when we did the first cut for the single.

Q. Do you know if Gary Stewart sang with him?

A. I don't know.

Q. You don't know that name?

A. No.

Q. Do you know if Robert Lawrence sang with him?

A. I don't know that neither.

Q. Do you know if Glen Parke sang with him?

A. I don't know.

MR. JAQUITH:  I don't have any further questions, your Honor.

MR. LAIDLAW:  Nothing.

THE COURT:  Thank you, Mr. Hidalgo. Call your next witness.

MR. LAIDLAW:  Before I do that, could I publish the exhibit?

THE COURT:  Yes.



**************************************************

I. DAVIDSON - CROSS

Page 2076

MR. LAIDLAW: I have no further questions of the lieutenant. Thank you.

THE COURT: Do you want to cross-examine him?

CROSS-EXAMINATION BY MR. WALSH:

Q. Did you go through Lackland Air Force Base for your basic training?

A. Yes, sir, for my basic training when I started out enlisted in 1983, December 1983.

THE COURT: Thank you very much. Call your next witness.

MR. LAIDLAW: Your Honor, with the court's permission, I call Mr. Juan Hidalgo at this time.

J U A N   H I D A L G O, called as a witness and being duly sworn, testified as follows:

DIRECT EXAMINATION BY MR. LAIDLAW:

Q. Good morning, sir. In a nice loud voice could you tell the jury your name, please?

A. Juan Hidalgo.

Q. Mr. Hidalgo, where do you live, sir?

A. 9508 125th Street.

THE COURT: Push that away from you a little bit. I think it will be a little more clear.

A. 9508 125th Street, New York.

Q. Mr. Hidalgo, can you tell the jury what you do for a

III.
J & N Records President, Juan Hidalgo's testimony at Gringo's federal trial on February of 1993, in support of his artist's talent and music career for SONY DISCOS picking up and releasing his CD, "DONDE LO CONSEGUISTE" on their MAJOR RECORD LABEL WITH INTERNATIONAL DISTRIBUTION OUTLETS.

J. HIDALGO — DIRECT
Page 2077

living?

A. I'm a record producer.

Q. And how long have you been in the music industry?

A. Twelve years.

Q. And where is your business located, sir?

A. Which one, because I have one -- I have a retail outlet, a wholesale and a production company.

Q. Well, where is your production company located?

A. 130 West 42nd Street.

Q. And you produce records; is that correct?

A. Yes.

Q. You also own record stores; is that what you're saying?

A. Yeah. Yes.

Q. And you act as an agent for various musical artists?

A. Yes, I do.

Q. What kind of music do you primarily deal in, sir?

A. Hispanic music, Latin.

Q. Is there any difference between Hispanic music and Latin music?

A. Well, we have different kind of music which we have like each country we come from we have our own music. Like where I come from I have my own music, I do like Salsa, Spanish rap.

Q. And you represent various performers, would that be so?

A. Yes.

Q. Do you know Jaime Davidson?

---

J. HIDALGO — DIRECT
Page 2078

A. Yes, I do.

Q. And can you tell the jury when did you first came to know of him?

A. One day I was recording in a studio and we needed a small part for a rapper in English, and the engineer was there doing the record recording, he represented Jaime, so he came in and he did the part and that's --

Q. When was that, sir?

A. That was in the summer of 1981, beginning the summer 1981.

Q. And did he subsequently become one of your clients?

A. He came by me to the distributor and we started talking about deals, dances that Jay, and by the end of summer we were working something out.

Q. Mr. Hidalgo, have you recorded a record that Mr. Davidson performed?

A. Yes.

Q. Okay. And when was that done, sir?

A. That was done at the end of the summer.

Q. Of which year?

A. 1981.

Q. And what's the title of the record?

A. Donde lo Consequiste, Gringo.

Q. For those of us that don't remember our high school Spanish, how would you translate that into English?

---

J. HIDALGO — DIRECT
Page 2079

A. Where Will You Find It?

Q. And does Mr. Davidson sing on all the cuts on that album?

A. Yes, he does.

Q. And which music corporation has cut that album?

A. SONY Music.

Q. SONY?

A. SONY.

Q. What type of music is on his record?

A. It's Spanish reggae. It's a rap song Spanish.

Q. Are they raps?

A. Yeah, rap.

Q. Is there a difference between Spanish reggae and rap?

A. Well, it's a little bit, it's similar to the American rap in a way.

Q. But it's in Spanish?

A. But it's in Spanish.

Q. I see. And have you attempted to promote his album since it was cut?

A. Well, yes, I have attempted to do so, but I can do what I do.

Q. And I am going to show you at this time what we've labeled as Defendants' Exhibit AK. Do you recognize that?

A. Yes, a poster.

Q. Can you speak a little louder so that all the people can hear you?

---

J. HIDALGO — DIRECT
Page 2080

A. Yeah, this is a poster that we do it for.

Q. That's a poster of who?

A. Gringo.

Q. And who is Gringo?

A. Davidson.

Q. Is that his nickname Gringo; on the album he is called Gringo?

A. Well, that's his artistic name.

Q. And this poster was produced to promote the record Gringo that he has made; is that correct?

A. Correct.

Q. Now, how many musical artists have you represented over the years, roughly?

A. I got over maybe about, about 17 albums active right now, so I near recording, I have like 200.

Q. Mr. Hidalgo, in your opinion does Jaime Davidson have a bright future in the music industry?

A. In my opinion he does, otherwise a big company like SONY disco wouldn't pick up the reggae.

MR. LAIDLAW:   Thank you. I have no further questions of this witness. I would like to offer into evidence at this time Defendants' AK.

MR. JAQUITH:   No objection.

THE COURT:   Received.

(Defendants' Exhibit AK received in

1/4/26, 3:55 PM          GRINGO'S LEGACY: SIGNS WITH J & N RECORDS AND SONY DISCOS - FREE JAIME.A.DAVIDSON.sr. !

J. HIDALGO - CROSS

evidence.)                                          Page 2082

CROSS-EXAMINATION BY MR. JAQUITH:

Q.  Mr. Hidalgo, what's your relationship with Mr. Davidson as far as profits from his performances?

A.  Well, I'm only recording.  I mean profitable performance out of that I don't have.

Q.  Excuse me, profits from recordings?

A.  You cannot tell in the music business.  If a record is not a hit, you have no profit.

Q.  But assuming that some are sold, how do you get paid?

A.  Well, I get paid for each album that is sold from the cost of the production, as far as you take off the cost, And then whatever you make after that.

Q.  Well, I guess what I'm asking you, sir, is what's your arrangements concerning that?  Do you get a percentage of each sale or do you get paid a flat rate or how do you get paid on Jaime Davidson's musical career?

A.  I get paid like a flat rate for each record that's sold.

Q.  Now, this SONY music that you spoke of, that's not the Japanese company that includes TV's and record players and that sort of thing, is it?

A.  The same company, yes.

Q.  Now, do you know who Mr. Davidson performs with, what other musicians and singers he performs with?

A.  No, I don't know that.

EILEEN McDONOUGH, R.P.R.
Official U.S. Court Reporter
(315) 423-5510

J. HIDALGO - CROSS

                                                    Page 2083

Q.  You don't know?

A.  I don't know each other performer.  The only one I know if he performed one time for my company.

Q.  Just this one record?

A.  For now.

Q.  Never previously booked him into any clubs or entertainment halls or anything like that?

A.  We did a promotional presentation one time when we did the first cut for the single.

Q.  Do you know if Gary Stewart sang with him?

A.  I don't know.

Q.  You don't know that name?

A.  No.

Q.  Do you know if Robert Lawrence sang with him?

A.  I don't know that neither.

Q.  Do you know if Glen Parke sang with him?

A.  I don't know.

MR. JAQUITH:  I don't have any further questions, your Honor.

MR. LAIDLAW:  Nothing.

THE COURT:  Thank you, Mr. Hidalgo.  Call your next witness.

MR. LAIDLAW:  Before I do that, could I publish the exhibit?

THE COURT:  Yes.

EILEEN McDONOUGH, R.P.R.
Official U.S. Court Reporter
(315) 423-5510

**************************************************************

IV.
Masters at Work Contract for "RAMA JAMA:" J & N Records negotiated that deal in 1994 for Gringo's mother, Mrs. Shirley Davidson, that was released on a HARD CORE HIP-HOP RHYTHM/BEAT for "CUTTING RECORDS."

Jaime A. Davidson, Sr.



## CALI'S LATINO RAPPERS
## They're Politically Correct!

**AZTLAN NATION**
**BY BILLY JAM**

**1992** is a very symbolic year for Berkeley Latino rap group Aztlan Nation, instead of being an occasion to celebrate the 500th anniversary of Christopher Columbus' "discovery" of America, it is a tragedy reminder of their nation, "to rid the pain of colonialism and raise the chains of economic slavery."

With their name, taken from the territory that includes "California, which was 'stolen' by the United States from Mexico in 1848, the outspoken Aztlan Nation are very much a Public Enemy for Chicanos. "We're not only in this for entertainment reason. We have a message and we feel we are a part of a movement," Minister Z and WORD UP.

Along with his credited partners, DJ Zeta, Anna Double M and MC Man the Gun X, he focuses on the group's goal, "to bring into focus the factors that separate our nation permeating issues of racism, assimilation, classism, racism and sexism, usher in the liberation of our people."

By constantly performing (often for free) at schools and colleges, rallies and clubs for Chicanos all over California, Aztlan Nation definitely practice what they preach, and they are not alone.

Like southern Cali's counterparts Kid Frost, Cypress Hill, A Lighter Shade Of Brown, etc. Aztlan Nation are part of a Bay Area wave of culturally and politically aware Chicano rappers which includes Mexicans del Barrio, D.F.T.C., featuring Mike the Mexican, and The Funky Aztecs.

On their six-inch debut "Chicano Blues" (TNT), Calabria's Funky Aztecs cover a range of relevant topics. "We let people show what's going on with the community. We talk about angel dust, which is very popular in the barrio, pre-eight assists, and safe sex..." observed rap testosterone kid WORD UP! His partner, Merciless, described the song "Straight Up Loco" as a "politically-conscious song toward the Chicano youth with the message, 'Let's get it together, Let's get organized.'"

San Francisco's D.F.T.C. have a similar message. The group's leader P., "The Mexican," explains, "D.F.T.C. stands for 'down for the cause,' and the cause is to uplift our community, tell our people that subculture is done by the police department and the government are no longer acceptable."

This message comes across loud and clear in their single "Lives Are For The Rich." Keep your head and ears open for each of these Bay Area culturally aware Latino rap acts. Then, 're really saying something.

26 WORD UP!

---

...Dominican heritage. The group's name comes from the Five Percent Nation of Islam's term for Latinos, and in 1993 they came out with their first single, "Smooth," Now, they have an album out on Poetic Groove/Interscope Records.

Prince says he got into hip hop through Breaking. When he was down with the Dynamic Rockers, and he was influenced to start writing rhymes by Run-DMC, L.L. Cool J and Mikey D, he explains. "Poverta's mission is to bring Latinos to the level of others to be respected in hip hop." He also adds that their lyrics reflect growing up as a young Puerto Rican in the city. Down with the Powerful family of artists are Tone Chaos, The Beatnuts production team, and famous Jorge been seen nationally in the video for Da Bossa "Pop Goes The Weasel."

"Walk Like A Duck" will be the first single from Curious Jorge's forthcoming album on Columbia Records produced by the Beatnuts. Sam Sever, Pete Nice, Prince Paul and Dumm as Jorge grew up in the same neighborhood as Rivers and recalls, "I remember the first time I saw them on the subway breaking and I didn't even know who it was. I just thought it was dope! Devastating! This was the first Hispanic rapper I ever saw when the Fearless Four video for 'Problems Of The Alpha Foxxy' came out. Then Charlie Chase and Cold Crush were on it too! I'll show and it made me feel good to say, Yo, these brothers are Spanish."

Last year, face 'N Smooth gave props to the famous Foxxe from the original Taino Indian name for Puerto Rico with that 'Spanish Fly' bi-lingual version of "My Alva Joe/My" translated by Rage-Rob. The Spanish Fly version was executed even more than the English version of the video of Black Jukebox.

And although he hasn't yet spoken about his background through his lyrics, rapper King Sun of Dominican heritage.

Equally important is the artist's talents are several other producers of Latino descent, including the Flavor Unit's 'Latee' 'Latee' Vega, who's worked with artists such as Queen Latifah and others, Nam 'Dan' Rodriguez who produced for Boogie Down Productions and Ichiboo, Ralph 'The Mexican' who has worked with DJ Frost and produced cuts on the house of Pain album, and T Ras Menzel, who started out as a rapper/artist on BDP on Big Boy Records and produced the single for Soul Dimension called "Front And Ready," recently sampled on Kenny 'Dope' Gonzales' latest release. Along with the rest of the Groove Diggers team, T Ras is working with new artists Urban Dwellers, Brothers In A Beatnut and the Chief Sred.

Look out both for the first release from Loco Latino's recently signed to Sonic Music as well as George & Miggy Axel and K. Swift other Latin artists who rhyme in Spanish include Vico-C and Lisa M from Puerto Rico, El General, Ruda Girl and others.

I close this article with a special shoutout of thanks to my fellow Latino activists for the hip-hop cause. Batucho the barber, host of the Scratch Armstrong radio show on WHCR in New York, Eddie B, Giant of Hot 97, the first Funny Puran D, with a strictly hip-hop show on a major commercial radio station in New York, Carmela Sanchez of LA, as well as Shauna Andres of the New Music Seminar.

We are all working for the day when there'll be no need for sixth hip hop, Latin hip hop, or White hip hop; just straight-up HIP HOP.

EXHIBIT (I).

178

EX. I



**WIKIPEDIA**
La enciclopedia libre

# The Original Gringo

**Jaime Davidson** ( Panama City , Panama ; October 16, 1968), better known by his stage name **Gringo el Original** , is a Panamanian musician and one of the pioneers of Panamanian Plena and reggae in Spanish . [1] [2] ]

## Biography

Jaime Davidson was born in Panama City on October 16, 1968. At a young age, he emigrated to the United States where he graduated from Lafayette High School in 1986. His musical career within Panamanian reggae began in 1991, when he performed Shabba Ranks ' reggae song "Trailer Load a Girl" in Spanish, titled "Trailer Llono de Guiales," in a Panamanian style. The instrumental version of this song has been widely used in the Puerto Rican reggaeton scene.

Just as he was about to release his first album as an artist, he was arrested and sentenced to life in prison for the murder of an undercover Pennsylvania police officer . He was also accused of leading a drug trafficking network that helped plan a cocaine heist from a rival. [1] (https://www.nytimes.com/2021/0 1/26/nyregion/jaime-davidson-clemency-syracuse.ht ml) According to accounts that presume his innocence, Gringo was about to record a song when a friend, apparently convicted in the case, borrowed his car to go somewhere. Thanks to Gringo, the friend arrived at the location, where a confrontation erupted between police and drug gangs in which Gringo was involved. During the shootout, one of the gang members killed a police officer, but because the car was borrowed, it was assumed that the killer was the owner of the vehicle, who was not present at the time of the incident.

This incident cost Gringo his freedom; he had just begun his artistic career in 1991 in Brooklyn , New York . Following the police investigation, Gringo was arrested in February 1992, [3] and charged with the murder of a police officer, without having had a trial or sentencing hearing. In 2021, before the end of Donald Trump 's presidential term , he was released after receiving a pardon from the former US president. [4] ]

### The Original Gringo



**Personal information**

| | |
|---|---|
| **Birth name** | Jaime Davidson |
| **Other names** | *Gringo the Original* , *Gringo Man* |
| **Birth** | October 16, 1968 (57 years old) Panama City , Panama |
| **Nationality** | Panamanian |

**Professional information**

| | |
|---|---|
| **Occupation** | Singer |
| **Years active** | 1986 - present |
| **Pseudonym** | *Gringo the Original* , *Gringo Man* |
| **Genres** | reggae in Spanish , dancehall |
| **Instrument** | Voice |
| **Related Artists** | Michael Ellis , El General , Nando Boom , Pocho Pan , Killer Ranks , Japanese |
| **Website** | Official website (http://freejaim… |

EX. J

# Discography

- 1992: *Where did you get it?* [5] ]

# See also

- 𓏢 Portal:Reggaeton . Content related to **Reggaeton** .
- Panama Plenary
- Reggae in Spanish

# References

1. Davidson, Jaime A. "History of Reggae" (http://prisonersforchanges.weebly.com/1historia-del-regg aeton.html) . *Prisoners for Change* . Retrieved June 2, 2013 .
2. Ellis, Michael F. "The History of Reggae" (http://www.michaelfellis.com/the-history-of-reggae/) (in English) . Retrieved July 2, 2013 .
3. "Gringo, The Original" has been imprisoned in the U.S. for 20 years (http://www.nextpanama.net/in dex.php?option=com_k2&view=item&id=528:%E2%80%9Cgringo-el-original%E2%80%9D-tiene-2 0-a%C3%B1os-preso-en-eua&Itemid=126). Retrieved February 4, 2013 .
4. "Panamanian rapper detained in the United States released. Trump commuted his sentence. Find out why (https://www.midiario.com/farandula/liberan-a-rapero-panameno-detenido-en-estados-uni dos-trump-conmuto-su-pena-enterate-por-que/) . " *www.midiario.com* . January 22, 2021. Accessed July 25, 2021 .
5. *Where You Got It - Gringo | Songs, Reviews, Credits | AllMusic* (https://www.allmusic.com/album/d onde-lo-conseguiste-mw0000940883) (in English) , accessed July 25, 2021 .

# External links

- Prisoners for Change (http://prisonersforchanges.weebly.com/)
- Gringo on Myspace (http://www.myspace.com/free.jaime.davidson)
- Gringo on YouTube (https://www.youtube.com/user/Gringo4243)

Obtenido de «https://es.wikipedia.org/w/index.php?title=Gringo_el_Original&oldid=165921429»

/ / Search results for "donde lo conseguiste"

Keyword          donde lo conseguiste

Share ➤

# Search Results

Top search results: 2
**Displaying:** 1-2 of 2

☐    Sort by ⌄    Grid View ⌄

☐    **1.    Full Title:**
         **Registration Number:**  SR0000148750
         **Date:**  1992-12-31
         **Type of Work:**  Music
         **Claimant:**  © on words, music; J&N Records (employer for hi...

☐    **2.    Full Title:**
         **Registration Number:**  SR0000175459
         **Date:**  1993-08-18
         **Type of Work:**  Sound Recording
         **Claimant:**  © ℗ on recording, artwork; J&N Records (employ...

10 rows ⌄

1          Go

*EX. K*

/ / Detailed Record View

Keyword        donde lo conseguiste

# Detailed Record View
## Registration record SR0000175459

Copyright Catalog
Displaying 2 of 2 entries

◀ Previous

# Donde lo conseguiste /Gringo.

Share ➡        Actions ⌄

| | |
|---|---|
| **Registration Number / Date** | SR0000175459 / 1993-08-18 |
| **Type of Work** | Sound Recording |
| **Title** | Donde lo conseguiste /Gringo. |
| **Date of Creation** | 1992 |
| **Date of Publication** | 1992-11-15 |
| **Copyright Claimant** | © ℗ on recording, artwork; J&N Records (employer for hire) |
| **Description** | Compact disc. |
| **Publisher Label Number** | Sony Tropical CDZ-80934 |
| **Imprint** | c1992. |
| **Notes** | Collection. |

/ / Detailed Record View

| Keyword | donde lo conseguiste |

# Detailed Record View
## Registration record SR0000148750
Copyright Catalog
Displaying 1 of 2 entries

Next ▶

## Donde lo conseguiste /Gringo

Share ➡   Actions ⌄

| | |
|---|---|
| **Registration Number / Date** | SR0000148750 / 1992-12-31 |
| **Type of Work** | Music |
| **Title** | Donde lo conseguiste /Gringo |
| **Date of Creation** | 1992 |
| **Date of Publication** | 1992-11-16 |
| **Copyright Claimant** | © on words, music; J&N Records (employer for hire) |
| **Description** | Sound cassette. |
| **Notes** | Collection. |
| **Names** | |

Recording Agreement

This is to confirm, and to serve as a memorandum of our
agreement, whereby  JAIME ALEXANDER DAVIDSON known as P/K/A
"GRINGO" (herein and after referred to as "Artist") resides
at 611 E. 21st apt 1G, Bklyn., N.Y 11226 S.S # 066-6404-34
shall record for

J&N Records, 524 Grand Street, Brooklyn, New York (herein
and after referred to as "Company").

1. Artist agrees to be employed by Company and to render
exclusive recording services to company during the term
hereof.

2. The term of this agreement shall commence upon execution
hereof and continue for one year from date hereof, but not
less than nine months from commercially and technically
satisfactory completion of first "LP" length recording
(whether in CD, Cassette or LP format).

Company shall have an irrevocable option to continue the
relationship for _____5_____ consecutive options each of
which is to be exercised by Company in writing not later
than 30 days of expiration of preceding term. Each such
option notification shall be subject to the condition of
undertaking the advance obligation specified below.

3. Minimum recording shall be one LP equivalent of a minimum
of 55 minutes each contract year.

4. Advances shall be as follows:

   a. First Album        $15·000

   b. Second Album       $16·000

   c. Third Album        $17·000

   d. Fourth Album       $18·000

Advances shall be payable as follows:$___5000___upon signing;
$__10·000___upon satisfactory completion and delivery of CD
length recording; $_____on U.S release date.

4. Notwithstanding reference to exclusive services hereunder,
nothing shall bar "sideman" appearances on a non-featured
and non-royalty basis, and "guest artist" status shall be
subject to company approval, not to be unreasonably
withheld.  Any such appearance shall require reference on
jacket to "Courtesy of J&N Records".

EX. L

(2)

5. Selections to be recorded hereunder shall be mutually approved. Wherever a musical composition is owned, written or controlled by artist, directly or indirectly, a mechanical reproduction license at 75% of statutory or customary rate will be deemed applicable, and in no event will maximum mechanical royalties exceed 10 times statutory. However, if the parties hereto shall enter into a publishing agreement, the above referred to reduced mechanical rate shall not be applicable, and full statutory rate shall be utilized.

6. Artist warrants and represents that there are no conflicting agreements not disclosed in writing prior to the time of signing hereof, which shall be annexed hereto as Exhibit "A" (if any) i.e. songs under re-recording restrictions.

7. Artist will be entitled to ___100___ free copies for promotional use; thereafter, each unit will be furnished by company to Artist at $7.50 each, which price will be proportionately adjusted in case of change in list price.

8. Artist will be entitled to ___25___ free copies of CD for promotional use after Company release date. Thereafter, each unit will be furnished by Company to artist at $_____ each which price will be proportionately adjusted in case of changes in list price. All such records are to be free of royalties hereunder. Should artist receive CD copies prior to release date, they are deemed personal copies and should not be used by Artist for promotional use without the prior consent of Company.

9. All recordings hereunder and all records and reproductions made therefrom, together with sound recording copyrights therein and the performances embodied therein, shall be entirely Company property free of any claims whatsoever by Artist or any person deriving any rights or interest from Artist. Artist acknowledges that Artist's performances in the sound recordings hereunder were made for hire within the scope of their employment and that Company is to be considered the author for the purpose of copyrights in sound recordings and that Company owns all of the rights comprised in such copyrights, including any rights to renew and extend the copyrights. Without limitation of the foregoing, Company and/or our subsidiaries, affiliates and licensees shall have the right to make CDs or other reproductions of the performances embodied in such recordings by any method now or hereafter known, and to sell and deal in the same under any trade-mark or trade names or labels as designated by us, or we may at our election refrain therefrom.

(3)

10. In the event of any dispute hereunder, it shall be referred to binding arbitration with the American Arbitration Association before a single arbitrator in the City of New York. New York jurisdiction is deemed to apply, regardless of where this agreement is executed.

Approved by: _____
Juan Hidalgo, President

_____
Nelson Estevez, Vice President

Approved by: _____     1112672832
Social Security # or Fed. I.D.

Artist: Jaime Alexander Davidson p/k/a Gringo

**J & N RECORDS**
**130 W. 42ND STREET #514**
**NEW YORK, NEW YORK 10036**
**(212) 869-6901**

Dated: February 12, 1996

Jaime Davison (a/k/a Gringo)

Dear Jaime,

Reference is made to the Recording Contract between you and J & N Records pertaining to the recording services of Gringo ("Contract").

By its signature below, the J & N Records hereby releases you to record via telephone from your current residence, one LP production to be exploited by the record company of your choice.

New York, New York                          J & N Records

By: Nelson Estevez

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**JAIME A. DAVIDSON SR.,**

Plaintiff,

v.

**J&N RECORDS, INC., et al.,**

Defendants.

_____/

## <u>AFFIDAVIT OF JAIME A. DAVIDSON SR.<br>IN SUPPORT OF COMPLAINT</u>

I, **Jaime A. Davidson Sr.**, being duly sworn, state as follows:

1. I am the Plaintiff in this action. I am over eighteen years of age and competent to testify. I make this affidavit based on my personal knowledge.

2. My current mailing address is 10226 Curry Ford Road, Suite 107-91, Orlando, Florida 32825. My phone number is 407-496-0809 and my email is jadavidson1610@gmail.com.

3. I am professionally known in the music industry as **"Gringo," "Gringo El Original,"** and **"Gringo Man."**

4. In or about 1990 I wrote the song **"¿Dónde Lo Conseguiste?"** ("DLC") in Brooklyn, New York. I first recorded DLC around January 1991 and then recorded the full album **DLC** around November–December 1991.

1

*EX. L-1*

5. I am the writer and original recording artist of DLC and the DLC album. The album is named after the song.

6. Around this time I met **Juan Hidalgo**, president of **J&N Records, Inc.** I provided him with a **D.A.T. tape** of my album so that he could listen and, if he liked it, shop it to major record labels. My understanding was that I would return later to sign a proper release and receive a signing bonus if a major label took the project.

7. I **never** signed any written recording agreement with J&N in August 1990. At that time I did not yet know J&N as a company, and I had not yet recorded the DLC album.

8. I did **not** sign the "Recording Agreement" that has been produced by J&N and is attached to my Complaint as **Exhibit L**. The handwriting and signature that purport to be mine are **not** my handwriting or my signature.

9. I did not authorize anyone to sign that agreement on my behalf and never knowingly agreed to the terms contained in the document.

10. The first time I ever saw Exhibit L was in or about June 2021, when my entertainment attorney, **Stephen Nale**, forwarded it to me as an attachment he received from **Marti Cuevas** of **Mayimba Music, Inc.** in an email stating that my album was "a $15,000 buyout" with "no record royalties provided for under the royalty agreement."

11. Before 2021, no one at J&N, Sony, or Mayimba had ever told me about a $15,000 buyout agreement or claimed that I had given up all record royalties in DLC.

12. On February 9, 1992, I was arrested and later incarcerated in federal custody. I remained in federal prison from 1992 until my release on or about January 20, 2021 after the President of the United States granted me clemency.

13. While I was incarcerated, J&N and Sony released and continued to exploit my DLC album. The album became very popular in Panama, Puerto Rico, the Dominican Republic, Colombia, and in the United States, particularly in Latino communities. I received little or no royalty payments.

14. From prison I wrote letters to J&N asking about my album and my masters. In a March 29, 2007 letter, J&N manager **Tony Moreno** wrote back that "Mr. Juan has told us to look for the masters and so far we can't find them." That letter is attached to the Complaint as **Exhibit G**.

15. On August 2, 2011 I received a letter from **BMI** stating that BMI does not pay mechanical royalties and that such royalties would be handled by "Juan & Nelson Publishing." BMI also told me that my songs had not been registered with BMI. That letter is attached as **Exhibit E**.

16. In 2019, without my knowledge or consent, J&N and Sony digitally re-released my DLC album and a remix track. I did not authorize any new digital release or agree to new terms.

17. After my release from prison, my attorney contacted Mayimba and J&N in 2021 to request an accounting and all agreements related to my album. The email chain with Mayimba is attached to the Complaint as **Exhibit I**.

18. In those emails, Mayimba for the first time claimed that there was a $15,000 buyout and forwarded the purported recording agreement (Exhibit L). I again state under oath that I never signed that agreement and never agreed to a buyout.

19. I have never knowingly given up my right to royalties in DLC. Any royalty payments that were made to my family were made without my knowledge and were not made pursuant to a buyout agreement that I signed.

20. While I was incarcerated, J&N and its partners also promoted another artist, **Omar Antonio Pacheco Bonilla**, under the name "Gringo Man" in connection with my music. I did not authorize anyone to perform or promote themselves as "Gringo Man" in my place.

21. The documents attached to my Complaint as Exhibits A through L are true and correct copies of records I received and maintained in the ordinary course of my dealings with J&N, Sony, Mayimba, BMI, and others.

22. I make this affidavit to support my request that the Court declare the purported recording agreement void, require Defendants to account for all revenues, and award me damages for their wrongful exploitation of my work and identity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _Feb. 7_, 2026, in _Orlando_, Florida.

**Jaime A. Davidson Sr.**

a/k/a "Gringo," "Gringo El Original," "Gringo Man"

4

## <u>DECLARATION UNDER PENALTY OF PERJURY</u>
## <u>(28 U.S.C. § 1746)</u>

I, **OMAR ANTONIO PACHECO BONILLA**, being over the age of eighteen, a citizen of Panama, hereby declare **under penalty of perjury under the laws of the United States of America** that the following facts are true and correct to the best of my knowledge and understanding, and I state them for legal purposes:

**This Declaration is being signed electronically via DocuSign by me, OMAR ANTONIO PACHECO BONILLA, while I am physically present in *Panama City, Republic of Panama*.**

## I. BACKGROUND

1. In or around January 1992, I was a young artist who was under the representation and artistic management of **JORGE CHÁVEZ**, a Peruvian national, now deceased.

2. As was customary, Mr. Jorge Chávez took me to lunch at the Hotel Aramo, located on Vía Brasil, Panama City, Republic of Panama.

3. That day, **JIMMY DAWSON** (deceased) appeared. He was the producer of the television program "Salsarengue," broadcast on Channel 13 in the Republic of Panama, and he was also involved in bringing artists for the "Hot Control" program on Telemetro and other events.

4. Mr. Jimmy Dawson arrived accompanied by an individual who was introduced as a promoter or representative of the record label Juan and Nelson Records. I do not recall that person's name with certainty.

1

*EX. L-2*

## II. PRIVATE MEETING AND PRESSURE

5. The restaurant had a private area, which Mr. Jorge Chávez, the representative of Juan and Nelson Records, and Mr. Jimmy Dawson entered.

6. I did not participate in that private meeting.

7. When they came out, Mr. Jorge Chávez appeared visibly nervous and upset.

8. Mr. Chávez later told me that these people represented the interests of the artist known as "Gringo," and that I was required to learn and perform that artist's songs because that artist had legal problems and was incarcerated.

9. When I expressed disagreement, Mr. Chávez told me I had to do it, stating that if I did not, we would have problems, especially me, which I understood as pressure and an indirect threat.

## III. IMPOSITION OF ABUSIVE ECONOMIC TERMS

10. I was informed that I had to surrender **EIGHTY PERCENT (80%)** of all income from my artistic performances, leaving only **TWENTY PERCENT (20%)** for me.

11. I was told that these individuals claimed they had invested approximately **TWENTY-FIVE THOUSAND DOLLARS (US $25,000.00)** and that they would recover that sum through the above withholding.

12. These terms were imposed on me without negotiation, without legal advice, and without access to a clear contract, taking advantage of my youth, inexperience, and dependency for work.

2

## IV. ECONOMIC HARM AND EXPLOITATION

13. During multiple performances, I received extremely low payments, and on many occasions only **ONE HUNDRED DOLLARS (US $100.00)** per event.

14. The remaining income, representing the 80%, was kept by the manager and the alleged representatives of the record label, without accounting, receipts, or formal settlement statements.

15. On one occasion, when my nephew picked me up after an event, he was surprised to learn that I had only received that amount.

16. Over time, I understood that I was being systematically exploited financially while other artists received fair and proportional compensation.

17. Years later, I learned that the contract contained abusive clauses, including indefinite duration, retention of 80% of my income, and near-total control over my artistic activities.

## V. HARASSMENT, HIDING, AND RELEASE

18. Due to constant pressure, veiled threats, and forced obligations to appear and perform, I was compelled to hide to avoid being located.

19. At that time, I worked at Nikos Café, and I asked the manager to say that I was working the night shift, in order to avoid being pursued.

20. This situation continued until the death of Mr. Jorge Chávez, who died of a heart attack.

3

21. His death represented a personal and professional liberation for me, because until that point I felt that everything I composed, performed, or produced was subject to unfair and abusive economic control.

## VI. FINAL DECLARATION

I declare under penalty of perjury pursuant to **28 U.S.C. § 1746** that the foregoing is true and correct.

I am executing this Declaration **electronically via DocuSign** while I am physically present in **Panama City, Republic of Panama**, for legal use in **Miami, Florida, United States of America**.

**Signed on this** 2/8/2026 **day of** 2/8/2026 **, 2026.**

Respectfully submitted,

Signature (DocuSign): _____
**OMAR ANTONIO PACHECO BONILLA**
**Location of Signature: Panama City, Republic of Panama**

4



*Ex. M*



1/4/26, 3:55 PM          GRINGO'S LEGACY: SIGNS WITH J & N RECORDS AND SONY DISCOS - FREE JAIME.A.DAVIDSON.sr. !

LAW OFFICES OF
Sandra E. Roper, RPh, J.D., LLM

CASILDA ROPER-SIMPSON, ESQ                                          JURISDICTION
Law Graduate Associate                                             New York
1391 Fulton Street                                                 New Jersey
Brooklyn, New York 11216                                           Washington, D.C.
(718) 636-6001
(718) 636-5454 Fax

March 22, 1996

J & N Records
130 West 42nd. Street
New York, NY 10036
Attn: Nelson Estevez

Please be advised that our office has been retained by Mr. Jamie Davidson (aka Gringo)

Please forward to my attention all and any signed contracts, if any, between your company,
J & N Distributions, and Mr. Davidson. Also, provide any and all documentations relating to all
record sales and royalties received and paid out on behalf of Mr. Davidson. Further, please
forward any and all outstanding royalties in your possession, as well as any accounting of all
royalty receivable due and owing.

Since Mr. Davidson was not represented by counsel at the time that the alleged contracts were
signed, forward any all correspondences and legal documents that relate to our client for our files

I will follow up this letter with a telephone call early next week. Thanking you in advance for
your anticipated cooperation in this matter.

Very truly,

LAW OFFICES OF SANDRA E. ROPER
Casilda E. Roper-Simpson, Esq

BY FAX

EXHIBIT (N).                                        EX. N

*************************************************

VI.
Letter from J & N Records dated, April 4, 1996.

_II._

Marti Cuevas
J & N Records
130 W. 42nd Street #514
New York, New York 10036
(212) 869-6901

April 4, 1996

Sandra E. Roper, J.D. LLM
Casilda Roper-Simpson, Esq.
139: Fulton Street
Brooklyn, New York 11216

Re: Jaime Davidson (Gringo)

Dear Ms. Roper,

I have done a preliminary job of getting together data which as you
will see represents a great deal of work for extremely minimal
sales. Enclosed are copies of **mechanical statements from Sony** and
we authorize you to call them directly to verify and or send you
record sales statements which should reflect identical sales. We
have been trying for years and have never gotten a record royalty
accounting statement from them yet so good luck!

I hope you have music law experience or this will make no sense to
you.

The following is a summary of Sony Accounting on mechanicals:

1/1/93 - 3/31/93  3,740 distributed   9 x $149.21 = $1442.82

4/1/93 - 6/30/93  returns 229 x 9  or $10.72 x 9

7/1/93 - 9/30/93  returns 127 x 9 or $15.32 x 9

10/1/93 - 12/31/93 returns 421 x 9 or $19.72 x 9

1/1/94 - 3/31/94  returns 196 x 9 or $7.61 x 9

4/1/94 - 6/30/94  returns 62 x0 or $2.90 x 9

I will locate the missing Sony statements from 1994 which are being
looked over by our accountant but they only reflect additional
returns. In all, I believe the record sold about 2,000 copies.

The following is for the compilation where "Donde Lo Consequiste"
occurred - I hope you know that nobody asked for this track. We
got a request for one of our big songs and they asked me to suggest
another so I suggested Gringo's song to help him out.

7/1/95 - 9/30/95  5877 copies  @ $.066  $387.88  (for your
information, **"Donde Lo Consequiste" is 50% Magic Juan**

EXHIBIT (Q).

As to these publishing royalties, Gringo has received two payments
of $800 and $932.48 as on the attached sheet. Before asking us to
send cancelled checks please ask Gringo if he remembers.

Our accountant is checking the date and amount of in pocket advance
paid to Gringo in 1992. It was in the area of $5,000 plus.

**Rama Jama** is not our record and we never received a penny more than
the money that we paid to Shirley Davidson in Gringo's name.
However, I am going to have to research exactly which account paid
the money. It could have been paid via our attorney's special
account and if I recall it was $1500. I will try my best to obtain
documents. **If I can't, call Cutting.** Shirley Davidson had a
signed power of attorney if I recall.

Sincerely,

Marti Cuevas

_EX.O_

**************************************************************



**23 WEST ENTERTAINMENT, INC.**
**23 WEST PRODUCTIONS, INC.**

respect to your right to sign and perform under this agreement. We shall have the right, but not the obligation to use your name (including your professional name Gringo) and your voice and likeness in connection with the recordings to be made hereunder and their exploitation.

5. At your request we shall furnish you with an instrumental track of the Master to enable you to perform so-called track dates, provide that (a) you shall not copy such track as furnished by us, nor give or lend it to any third party, and shall use it solely for track dates performed by you, (b) you shall advertise and announce your performance as being available on a label to be determined and produced by us. We shall not authorize the use of said track by any other singer provided that you make yourself available as and when we reasonably require to perform for promotional purposes.

6. You agree that you will not, for a period of five (5) years after the date hereof, perform or re-record the musical compositions or material contained on any Master for anyone other than us for the purpose of making or distributing phonographic records.

7. This document records the entire understanding between us with respect to the subject matter, and it may only be changed by a subsequent written document signed by the party sought to be bound thereby. If any portion of it shall be invalid or unenforceable that will not affect the rest; the invalid or unenforceable portion of the agreement shall be deemed severed from the whole, and the remaining portion shall be valid and enforceable to the full extent permitted by law. This agreement shall be construed in accordance with the laws of the State of New York applicable to contracts entered into and wholly to be performed within said state. Any controversies under this agreement shall be adjudicated before a competent court located in New York County.

If the foregoing constitutes your understanding as it does ours, please signify by signing below.

Very truly yours,
MASTERS AT WORK PRODUCTIONS, INC.

By: _____

ACCEPTED AND AGREED TO:

_____
Jaime Davidson pka Gringo

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

V.

Attorney, Mrs. Casilda Roper-Simpson's letter to J & N Records dated, March 22, 1996;

1/4/26, 3:55 PM          GRINGO'S LEGACY: SIGNS WITH J & N RECORDS AND SONY DISCOS - FREE JAIME.A.DAVIDSON.sr. !

EXHIBIT (T).                    *VII.*

MARTI CUEVAS
**J & N PUBLISHING**
130 W. 42ND STREET #514
NEW YORK, NEW YORK 10036
TEL: (212) 869-6901
FAX: (212) 869-8896

To: Sandra Roper
From: Marti Cuevas
Fax:  (718) 638-6081
Date: April 10, 1996

    Re: Gringo Release

Dear Ms. Roper,

I have attached for the moment an unsigned draft of the contract
between Gringo and J & N; as I told you on the phone, I was not
with the company when the contract was signed and I don't have a
signed copy in my files.  I assume the executed copy is either at
the distributor or in our safe deposit box - Ask Gringo if he has
a signed copy.

I called Juan in Puerto Rico and asked him to call you which I hope
he did.  However he did authorize me to send you the this simple
release, though I cannot be a signatory; Juan will be in town on
the 18th or, if you wish, I can't get a fax signature separately
from Juan.  In the meantime, please obtain a counter-signature and
return.

Additionally I have annexed a report of payments made with relation
to Gringo's production.  In the first place an in-pocket advance of
$5,000 was paid directly to Gringo and $9,000 to the individual who
was apparently **Gringo's manager/producer, Paul Denom Tagnaq.**  The
**other expenses include production, a trip to Jamaica to record,**
several loans, etc.  **In 1991, J & N was a brand new record company
and Gringo an entry-level artist with talent.**

As to the deal with **Rama-Jama,** I have no idea where the file
regarding this song is.  However, you can obtain all pertinent
information by **calling Cutting Records directly.**  The song is not
ours and we simply released Gringo for an advance which was paid
100% to Shirley Davidson.

In the future, please fax requests and I will do my best to answer
them as quickly as possible.  In the meantime, if you require

letters of authorization to obtain verification of any receipts at
the source, I will be glad to furnish you with same.  We have
absolutely nothing to hide and if there is a discrepancy, I can
assure it it is an error.2

Sincerely,

*EX. P*

23 WEST ENTERTAINMENT, INC.       EXHIBIT  (K).
23 WEST PRODUCTIONS, INC.

## MASTERS AT WORK PRODUCTIONS, INC.

c/o 23 West Entertainment
71 West 23rd Street, Suite 1611
New York NY 10010

Dated: October___, __ 1992

Jaime Davidson pka Gringo
611 East 21st Street, #1G
Brooklyn NY 11226

Dear Jaime:

The following, when executed by you and on behalf of us, shall constitute an agreement between us.

1.      You have agreed to perform for us as a vocalist in connection with recording of the following compositions to be recorded and delivered to us on the following terms which you have accepted.

2.      You shall perform for us at studios to be designated by us and at times to be mutually agreed with you, but which we expect to be approximately two to three weeks after you have executed this agreement, as a vocalist and/or rapper the following composition(s):

                           RAWA JAWA

The recordings of the aforesaid compositions shall each be referred to herein as a "Master" and collectively as the "Masters" if there is more than one.  If necessary, and at our request, you shall rerecord any selection until a Master satisfactory in our sole judgment is obtained.

3.      For your services hereunder, we shall pay you the sum of $500 as a one time payment for your work for hire.  Such sum shall be paid at the time you perform your services hereunder, or when you execute this agreement, whichever shall occur later.  You hereby confirm that we shall own all right, title and interest, including worldwide copyright (and the right to renew such copyright in and to the Masters which contain your recorded performance(s) including, but not limited to your performances as a musician and/or vocalist and we shall, in connection therewith, be entitled to exploit the Masters in all configurations in all media throughout the universe, in perpetuity, as we or our licensees, in our sole discretion may determine, or to refrain therefrom.

4.      You warrant and represent that no contract or agreement entered into by you prior to the date hereof shall interfere in any manner with complete performance of this agreement by you.  You are under no disability, restriction or prohibition with

EX. Q

IX.

Jaime A. Davidson
#37593-053 Unit-3A
USP - Allenwood
P.O. Box 3000
White Deer, PA. 17887

April 17th, 1996

Sandra E. Roper, J.D. LLM
Casilda Roper-Simpson, Esq.
1391 Fulton Street
Brooklyn, New York 11216

Re: Jaime A. Davidson (Gringo) Royalty Statement Computations.

Dear Mrs. Simpson,
        Greetings to you and the family in the precious name   of   God.
Praying that this letter finds you all up to par.   Herein, I'm enclo-
sing various documents to enlighten you on my musical status.   I   am
also enclosing a copy of J & N's Royalty Statement computations   in
order to have you see the difference with both computations.

Mrs. Casilda, in order to get the record straight, you must obtain from
Sony Discos the following: A copy of the original signed contract be-
tween Sony, J & N and Gringo, for the release of Gringo's   Album   on
Sony Label, and for Gringo been signed to Sony Discos, as J & N informed
Gringo; a copy of the contract between Sony and J & N for allowing Sony
to use Donde Lo Conseguiste (Remix), in a various artists compilation
CD; a complete Royalty Statement print out from Sony, from 1/1/93 till
this present date (4/20/96) for Gringo's Donde Lo Conseguiste Album;
a complete Royalty Statement print out sheet of Gringo's   Donde Lo
Conseguiste (Remix) on the Sony compilation CD with various   spanish
artists from the date it was released, till this present date 4/20/96;
and any and all monies payed by Sony to J & N excluding none, also for
any and all of Gringo's productions, excluding none from 1992 - 1996.

Nevertheless, from the Sony Royalty Statements furnished to your office
by J & N, J & N collected from Sony for Gringo's Album  in  the  ball
park of "$8,906.50 " including Publishing: " $4,453.25 "  deducting
Publishers Royalties; Gringo only collected " $1,732.48 " from those
figures mentioned above, after the release of his Album; and  they also
gave me " $50.00 " to buy a pair of sneakers.

In addition, J & N alleges (as a favor) that they were looking out for
me (Gringo), when they payed me the Album's Publishing Royalties.   It
took J & N almost a year to turn over Gringo's Royalties mentioned in
all the breakdowns in this package.  Gringo only found out of the Ro-
yalties, upon his request for legal assistance fee; he would have never
known he had anything coming to him, if he hadn't asked for assistance.

Thank you very much for your time and consideration.  I'll give  you a
call upon your receipt of this package.

Very truly yours,

*Jaime A. Davidson*

EXHIBIT (W).          Jaime A. Davidson

EX. R

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

X.
Reflections of Gringo's
recorded SONY DISCOS "ROYALTY STATEMENTS."

Search artists, albums and more...



,                                          – Donde Lo
## Conseguiste

Label:                          – JN-533-12
Format:                  , 12"
Country:
Released:
Genre:
Style:

**Release**

 [r5621848]

New Submission

**For Sale**



VINYL
**Donde Lo Conseguiste**
From $6 to $31

## Tracklist

A1                          – Donde Lo Conseguiste (Reggae)
B1                          – Donde Lo Conseguiste (42nd Hip Hop Version)
B2              ,                   Donde Lo Conseguiste - Rap)
                          –

## Credits

Lyrics By –                        (tracks: A1, B1, B2)

## Reviews

Add Review

**Statistics**

| Have: | | Last Sold: | |
| --- | --- | --- | --- |
| Want: | | | |
| Avg Rating: | 4.33 / 5 | Low: | $1.50 |
| Ratings: | | Median: | $8.00 |
| | | High: | $17.43 |

☆☆☆☆☆

🎞 Add to Collection

👁 Add to Wantlist

**Videos (8)**





### Let's manage your privacy

This website uses cookies and similar tracking technologies. To learn more about our use of personal data, please
visit our                . By clicking "Accept All", you consent to sharing and recording your website activity,
including information about your site usage with our social media, advertising, and analytics partners. If you wish
to decline, click the "Reject All" button below. You can change your preferences at any time by visiting the "Cookie
Settings" link at the bottom of each webpage. By using this website, you consent to our                .

Cookies Settings



*EX. S*

Search artists, albums and more...    🔍

## * – Donde Lo Conseguiste

| | |
|---|---|
| Label: | – CDZ-80934 |
| Format: | , Album |
| Country: | |
| Released: | |
| Genre: | , |
| Style: | |

**Release**    ⊙ [r15365191]

New Submission

**For Sale**



CD
**Donde Lo Conseguiste**
From $110 to $120

### Statistics

| | |
|---|---|
| Have: | |
| Want: | |
| Avg Rating: | 5 / 5 |
| Ratings: | |

Last Sold:

| | |
|---|---|
| Low: | $7.39 |
| Median: | $24.04 |
| High: | $40.70 |

☆☆☆☆☆

🗐 Add to Collection

👁 Add to Wantlist

## Tracklist

| 1 | Pasaporte Pa' Mi Cañon |
|---|---|
| 2 | Mi Morena |
| 3 | Menea Para Arriba |
| 4 | Mujer Lociono |
| 5 | Donde Lo Conseguiste |
| 6 | Mama |
| 7 | Te Ves Bien Buena |
| 8 | Tiny Winy |
| | **Bonus Track** |
| 9 | Donde Lo Conseguiste |

**Videos**

**Lists**

## Companies, etc.

Copyright © –
Phonographic Copyright ℗ –
Manufactured By –
Recorded At –
Produced For –
Designed At –

**Contributors**

## Credits

Artwork, Design –
Featuring –       * (tracks: 3, 8),          (tracks: 9)
Lyrics By, Written By –       *
Music Director –            *.

## Barcode and Other Identifiers

Barcode: 03762809342

## Reviews

Add Review



$34⁹⁹
Any Castrol® EDGE®
Full Synthetic, 5 qts.
and an STP® oil filter®

## Let's manage your privacy

This website uses cookies and similar tracking technologies. To learn more about our use of personal data, please
visit our            . By clicking "Accept All", you consent to sharing and recording your website activity,
including information about your site usage with our social media, advertising, and analytics partners. If you wish
to decline, click the "Reject All" button below. You can change your preferences at any time by visiting the "Cookie
Settings" link at the bottom of each webpage. By using this website, you consent to our

Cookies Settings





Label:

Sony Tropical – CDZ-80934

Format:

CD, Album

Country:

US

Released:

1992

Genre:

Reggae, Latin

Style:

Dancehall

2   MC Moreno

3   Menea Para Arriba

4   Mujer Lociono

5   Donde Lo Conseguiste

6   Mama

7   Te Ves Bien Buena

8   Tiny Winy

    **Bonus Track**

9   Donde Lo Conseguiste


# Credits

Artwork, Design – Drago (22)
Featuring – Tito* (tracks: 3, 8), Magic Juan (tracks: 9)
Lyrics By, Written By – Gringo*
Music Director – Denis D. Menace*, Mr. Doo


# Companies, etc.

Copyright © – J&N Records
Phonographic Copyright ℗ – J&N Records
Manufactured By – Sony Discos Inc.
Recorded At – HC&F Studio
Produced For – J&N Records
Designed At – Drago Artistic Designs, Inc.

**Registration #:**   SR0001054582
**Service Request #:**   1-15085166458

## Mail Certificate _____

Jaime Alexander Davidson

United States

**Priority:**   Special Handling          **Application Date:**   January 26, 2026

## Correspondent _____

**Name:**   Jaime Alexander Davidson
**Email:**   jadavidson1610@gmail.com
**Telephone:**   (407)284-5858
**Alt. Telephone:**   (407)496-0809
**Address:**

United States

*EX. U*

**Registration Number**

## SR 1-054-582

**Effective Date of Registration:**
January 26, 2026

**Registration Decision Date:**
February 03, 2026

## Title _____

| | |
|---|---|
| **Title of Work:** | Works Published on the Album Donde Lo Conseguiste |
| **Title of Larger Work:** | Donde Lo Conseguiste |
| **Content Title:** | Pasaporte Pa Mi Canon |
| | Mi Morena |
| | Menea Para Arriba |
| | Mujer Lociono |
| | Donde Lo Conseguiste |
| | Mama |
| | Te Ves Bien Bien |
| | Tiny Winy |

## Completion/Publication _____

| | |
|---|---|
| **Year of Completion:** | 1992 |
| **Nation of 1ˢᵗ Publication:** | United States |

## Author _____

| | |
|---|---|
| • **Author:** | Jaime Alexander Davidson |
| **Pseudonym:** | Gringo Man |
| **Author Created:** | Sound recording(s): All Tracks Being Registered |
| **Work made for hire:** | No |
| **Citizen of:** | United States |
| **Domiciled in:** | United States |
| **Year Born:** | 1968 |
| **Pseudonymous:** | Yes |

**Registration Number**

# SR 1-054-582

**Effective Date of Registration:**
January 26, 2026

**Registration Decision Date:**
February 03, 2026

## Copyright Registration for a Group of Works Published on the Same Album
Registration issued pursuant to 37 C.F.R. § 202.4(k)

### Titles

|  |  |
|---|---|
| **Group Title:** | Works published on the album Donde Lo Conseguiste |
| **Album Title:** | Donde Lo Conseguiste |
| **Album Label:** | J&N Records |
| • **Title of Work:** | Pasaporte Pa Mi Canon, Album Track Number 1 |
| • **Title of Work:** | Mi Morena, Album Track Number 2 |
| • **Title of Work:** | Menea Para Arriba, Album Track Number 3 |
| • **Title of Work:** | Mujer Lociono, Album Track Number 4 |
| • **Title of Work:** | Donde Lo Conseguiste, Album Track Number 5 |
| • **Title of Work:** | Mama, Album Track Number 6 |
| • **Title of Work:** | Te Ves Bien Bien, Album Track Number 7 |
| • **Title of Work:** | Tiny Winy, Album Track Number 8 |

### Completion/Publication

|  |  |
|---|---|
| **Year of Completion for the Works Published on the Album:** | 1992 |
| **Date of First Publication for the Album:** | November 15, 1992 |
| **Nation of First Publication:** | United States |
| **Works released on a digital album:** | No |
| **Works released on a physical product:** | Yes |

### Author

|  |  |
|---|---|
| • **Author:** | Jaime Alexander Davidson |
| **Pseudonym:** | Gringo Man |

*EX. V*

Page 1 of 2

|  |  |
|---|---|
| **Author Created:** | Sound recording(s): All Tracks Being Registered |
| **Work made for hire:** | No |
| **Citizen of:** | United States |
| **Domiciled in:** | United States |
| **Year Born:** | 1968 |
| **Pseudonymous:** | Yes |

## Copyright Claimant

**Copyright Claimant:** Jaime Alexander Davidson

United States

## Certification

|  |  |
|---|---|
| **Name:** | Jaime Alexander Davidson |
| **Date:** | January 26, 2026 |

|  |  |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Regarding group registration: A group of sound recordings and any associated literary, pictorial, or graphic works may be registered in Class SR under 37 C.F.R. 202.4(k) if the following requirements have been met: 1) all of the works must be contained on the same album, as defined in 37 C.F.R. 202.4(k)(1)(i); 2) the group may include up to twenty sound recordings, together with any associated literary, pictorial, or graphic works included with the same album; 3) all the works in the group must be published on the same album and on the same date, all the works must be first published in the same country, and the date and nation of first publication for the album must be specified in the application; 4) the application must provide the title for the album and a title for each work in the group; 5) all the works in the group must be created by the same author, or the works must have a common joint author; 6) the copyright claimant or co-claimants for all of the works in the group must be the same person or organization; and 7) the works may be registered as works made for hire if they are identified in the application as such.

Regarding deposit: Special Relief granted under 37 CFR 202.20(d). |

associated literary, pictorial, or graphic works may be registered in Class SR under 37 C.F.R. 202.4(k) if the following requirements have been met: 1) all of the works must be contained on the same album, as defined in 37 C.F.R. 202.4(k)(1)(i); 2) the group may include up to twenty sound recordings, together with any associated literary, pictorial, or graphic works included with the same album; 3) all the works in the group must be published on the same album and on the same date, all the works must be first published in the same country, and the date and nation of first publication for the album must be specified in the application; 4) the application must provide the title for the album and a title for each work in the group; 5) all the works in the group must be created by the same author, or the works must have a common joint author; 6) the copyright claimant or co-claimants for all of the works in the group must be the same person or organization; and 7) the works may be registered as works made for hire if they are identified in the application as such. Regarding deposit: Special Relief granted under 37 CFR 202.20(d).

**Date of First Publication for the Album:**
1992-11-15

**Nation of First Publication:**
United States

**Names:**
Davidson, Jaime Alexander 1968-
Gringo Man, pseud. 1968-

**USCO Catalog Link:**
https://publicrecords.copyright.gov/detailed-record/siebel_SR001054582

---

Disclaimer: This material was generated by the U.S. Copyright Office's Copyright Public Records System (CPRS). For certified records, contact the ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚. For information on searching copyright records, see ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚. For information on removing personal information from Copyright Office public records, refer to ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚.